Howard LIPINSKI, Petitioner-Appellant,

v.

PEOPLE of the STATE OF NEW
YORK, Respondent-Appellee.

No. 826, Docket 76–2154.

United States Court of Appeals,
Second Circuit.

Argued March 8, 1977.

Decided March 28, 1977.

Phylis Skloot Bamberger, New York City
(William J. Gallagher, The Legal Aid Socie-
ty, Federal Defender Services Unit, New
York City, of counsel), for petitioner-appel-
lant.

Vincent L. Leibell, III, Asst. Dist. Atty.,
Westchester County, White Plains, N.Y.
(Carl A. Vergari, Dist. Atty., Westchester
County, White Plains, N.Y., of counsel), for
respondent-appellee.

Before KAUFMAN, Chief Judge, and
SMITH and MULLIGAN, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

The hoary rule of evidence that prevents
a party from impeaching his own witness
has plagued scholars for over fifty years.
The consensus of modern commentators is
forcefully expressed by Professor Morgan:
"the general prohibition, if it ever had any
basis in reason, has no place in any rational
system of investigation in modern
society." [1]

██ Nevertheless, many states continue
to adhere to the traditional rule, at least in
some form. See 3A *Wigmore on Evidence*
§§ 896–906 (Chadbourne ed. 1970). The
State of New York provides by statute that
a party in a criminal case may impeach his
own witness with a prior inconsistent state-
ment only if the prior statement is either
sworn or subscribed.[2] We are asked today

---

1. E. Morgan, Basic Problems of Evidence 70–71
(1962).

2. New York law provides:
   Rules of evidence; impeachment of own wit-
   ness by proof of prior contradictory state-
   ment

1. When, upon examination by the party
who called him, a witness in a criminal pro-
ceeding gives testimony upon a material is-

to hold that the use of the New York "voucher" rule, which prevented Howard Lipinski from impeaching the store detective who arrested him for petty larceny, deprived Lipinski of a fair trial. But despite the questionable basis of the voucher rule, we believe that the trial judge's refusal to permit Lipinski to impeach his own witness did not so impair Lipinski's defense that his ultimate conviction violated the due process clause. Accordingly, we will affirm the denial of Lipinski's petition for habeas corpus.

## I.

A brief summary of the facts is indispensable for an understanding of this case. In the evening of March 15, 1974, Howard Lipinski entered the Gimbels Department Store at the Cross County Shopping Center through the Central Park doors. He immediately attracted the attention of two store detectives, Robert Bendetson and Michael Starrish, because he had been involved a short time previously in an altercation with a Gimbels salesgirl. Starrish testified that Lipinski wore a raincoat and carried an ordinary brown shopping bag with the curved handle of a black umbrella protruding. Their suspicions aroused, the detectives decided to follow Lipinski's progression through the store.

Lipinski walked immediately to the staircase leading to the basement, the detectives close behind. As Lipinski descended, Starrish was no more than six inches away and had a clear view of the contents of the shopping bag. He testified that it was empty save for the black umbrella.

The store detectives pretended to shop for phonograph records while they maintained surveillance over Lipinski. Starrish testified that Lipinski proceeded immediately to the tennis racket display in the Sporting Goods Department. There, setting his shopping bag on the floor, Lipinski carefully looked around to satisfy himself that he was not being watched. He then removed two tennis rackets from the wall, glanced about him once again, and placed them into the shopping bag. Lipinski then approached the sales counter and engaged the attention of a clerk.

The salesman, Louis Pistecchia, testified that Lipinski sought to "return" the tennis rackets in the shopping bag for a cash refund. Lipinski presented a sales slip dated the previous day which showed he had purchased two tennis rackets of the same model (Wilson T–3000) as those he had just removed from the wall. Pistecchia asked Lipinski to wait while he went to the manager's office with the sales slip to procure a return voucher. The sales clerk was intercepted by Starrish, who explained that Lipinski had not brought the tennis rackets into the store but had just taken them from the wall display. Pistecchia proceeded with the transaction as directed. Lipinski duly signed the voucher, and the sales clerk secured the manager's approval. Pistecchia then delivered the return voucher, made out for $106.98, to Lipinski and directed him to the credit department for his refund.

After Lipinski had left the sales area, Starrish approached him, identified himself as a store detective, and confronted him with the skein of events the detective had just witnessed. Lipinski remained silent.

sue of the case which tends to disprove the position of such party, such party may introduce evidence that such witness has previously made either a written statement signed by him or an oral statement under oath contradictory to such testimony.

2. Evidence concerning a prior contradictory statement introduced pursuant to subdivision one may be received only for the purpose of impeaching the credibility of the witness with respect to his testimony upon the subject, and does not constitute evidence in chief. Upon receiving such evidence at a jury trial, the court must so instruct the jury.

3. When a witness has made a prior signed or sworn statement contradictory to his testimony in a criminal proceeding upon a material issue of the case, but his testimony does not tend to disprove the position of the party who called him and elicited such testimony, evidence that the witness made such prior statement is not admissible, and such party may not use such prior statement for the purpose of refreshing the recollection of the witness in a manner that discloses its contents to the trier of the facts.

C.P.L. § 60.35.

Starrish asked Lipinski to accompany him and Bendetson to the security office. As they reached the top of the stairs leading to the ground floor Lipinski bolted for the door. The two detectives thwarted the escape and, after a slight struggle, handcuffed him.

In the store security office Lipinski was questioned but obdurately refused to answer. He was, accordingly, turned over to the Yonkers police. After Lipinski had left, the detectives found the return voucher, signed by the accused, crumpled behind the chair where he had been sitting.

Bendetson signed an information the following day. Shortly thereafter, Lipinski's father, Arthur, a retired lawyer, interviewed Bendetson concerning the incident. A tape recording reveals Bendetson's story as follows:

[Bendetson] He came in through the Central Park Doors, the Men's Department. We followed him in. He's been in the store before. Well, that's beside the point.

I saw he had a shopping bag. We followed him down. Inside the shopping bag nothing was sticking out. We followed him into the Sporting Goods Department. He went right to the tennis rackets. He took two tennis rackets off the wall and put them inside the shopping bag. I saw this and so did somebody else. He then went over to the cash register and produced a receipt for them. And that was that.

[A. Lipinski] He only took two racquets from the wall, you say?

[Bendetson] He took two tennis racquets off the wall and put them into the shopping bag. There was another tennis racquet too; whether he wanted to buy it or exchange it or what, I don't know. All I did was, see him take two tennis racquets off the wall and put them into the shopping bag; and walk over to the cash register.

\*     \*     \*     \*     \*     \*

[A. Lipinski] . . . [y]ou followed him because he had a big bag?

[Bendetson] Sure.

[A. Lipinski] were you able to see what he had in that bag?

[Bendetson] No. But I know he didn't have two tennis racquets. It was impossible to have two tennis racquets in there.

[A. Lipinski] How big a bag was it?

[Bendetson] Regular size shopping bag.

[A. Lipinski] Well, a regular size shopping bag is big enough.

Lipinski was tried before Yonkers City Judge Robert W. Cacace and a jury on October 7, 1975. The state relied upon Michael Starrish and Louis Pistecchia to establish the sequence of events. Lipinski, proceeding pro se, called Bendetson to the stand. The detective admitted that he had not read the complaint before signing it and that the document contained several errors. The time of day, Lipinski's address, and the spelling of Lipinski's name were incorrect. In addition, the value of the merchandise was set forth rather than the value of the voucher.

After exploring these mistakes, Lipinski directed his questioning to the conversation between his father, Arthur Lipinski, and Bendetson. At this point, Judge Cacace patiently explained and repeatedly emphasized that Lipinski would not be permitted to impeach his own witness with a prior inconsistent statement, unless the out-of-court declaration was a subscribed writing or a statement under oath. Despite the Judge's warning Lipinski insisted on proceeding to examine Bendetson, who confirmed Starrish's testimony, including the statement that there was an umbrella in Lipinski's shopping bag when he entered the store. This, of course, seems to contradict the tape recording of Bendetson's comments on March 16, which indicates that Bendetson did not see an umbrella in Lipinski's shopping bag.

The jury found Lipinski guilty of attempted petty larceny, and Judge Cacace sentenced him to 30 days imprisonment in the Westchester County Penitentiary, service of which was stayed pending appeal. The Appellate Term of the Supreme Court thereafter affirmed Lipinski's conviction,

though it did suggest that the legislature should "modernize" the law to permit impeachment of one's own witness by prior contradictory statements preserved on tape: taped declarations, the court observed, provide the same level of reliability as a subscribed or sworn statement. The New York Court of Appeals denied leave to appeal.

On July 7, 1976, Judge Werker denied Lipinski's petition for habeas corpus on the ground that the limitation of Lipinski's cross-examination of Bendetson did not raise a constitutional infirmity to the conviction.

## II.

■ A. *The standard to be applied.* The states have traditionally been accorded great latitude in determining rules of evidence to govern proceedings in their own courts. In this sensitive area, characterized by delicate and interrelated judgments of fairness and efficiency, the federal courts have trod lightly to refrain from abrasive disruptions of state procedures and to avoid rigidity in an area of law that should be, above all others, empirical.

The benchmark case is *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Leon Chambers was convicted of murdering a policeman, although another man, McDonald, had confessed to the crime. McDonald was called as a witness by the defendant, but repudiated his confession on the stand. Because of the Mississippi rule that a party vouched for the veracity of his witness, Chambers was not permitted to cross-examine McDonald regarding his repudiation. And, since Mississippi did not recognize declarations against penal interest as an exception to the hearsay rule, Chambers was not permitted to introduce testimony from three witnesses that McDonald had told them that he, not Chambers, had shot the policeman.

The Supreme Court held that the use of the voucher and the hearsay rules in tandem violated Chambers's due process right to a fair trial, since it drastically hampered Chambers's ability to demonstrate to the jury that McDonald, not Chambers, committed the crime. Justice Powell, however, was careful to limit the holding:

> [W]e establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.

410 U.S. at 302–03, 93 S.Ct. at 1049. The touchstone established by *Chambers*, accordingly, is simply that of fundamental fairness. This standard is sufficiently flexible to avoid excessive interference with state procedures, *see Maness v. Wainwright*, 512 F.2d 88 (5th Cir. 1975), *cert. granted*, 429 U.S. 893, 97 S.Ct. 253, 50 L.Ed.2d 176 (1977), yet sensitive enough to prevent the grave injustices that may result from the mechanistic application of evidentiary rules.

This court has extended *Chambers* under certain circumstances to situations in which the application of the voucher rule alone is involved. *See Welcome v. Vincent*, 549 F.2d 853 (2d Cir. 1977). But, we too have approached the difficult task of assessing the constitutional validity of particular applications of state evidentiary rules with salutary caution. Judge Oakes wrote for the court in *Welcome*:

> Our holding is narrowly confined to rare situations . . . where another person, present on the witness stand, has previously confessed that he, rather than the defendant on trial, has perpetrated the crime. We hold that to restrict examination of such a witness, so that his prior confession may not be proven, is to deny the defendant a fair trial, at least when the confession, though retracted, has some semblance of reliability . . . . We disavow any attempt to "constitutionalize" the law of evidence pertaining to the use of prior statements of a witness, except to the extent of answering the narrow question left open

in part by the nature of the holding in *Chambers.*

*Id.* at 858.

B. *The legitimate interests served by the voucher rule.* In considering whether a criminal defendant has been denied due process by the application of the voucher rule, we cannot ignore the questionable basis of the rule itself. The voucher rule appears to be one of those atavisms that no quantity of reasoned criticism seems able to destroy,[3] though the federal courts[4] and many states[5] have now abandoned it. The origin of the rule against impeaching one's own witness is shrouded in the mists of time. Perhaps the rule is nothing more than a relic of the ancient procedure of compurgation by oath;[6] perhaps it is a mere excess generated by the emergent adversary system of the Seventeenth

Century.[7] In any event, few rules of the common law appear to better justify Holmes's acid aphorism,

It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.

Oliver Wendell Holmes, *Path of the Law,* 10 Harv.L.R. 457, 469 (1897).

The traditional justifications of the rule against impeaching one's own witness are plainly bankrupt. No thoughtful jurist or scholar will today defend the proposition that a party is morally bound by the testimony of his witnesses. And, since it is universally accepted that a party must take his witnesses where he finds them, it is

---

**3.** *See Chambers v. Mississippi,* 410 U.S. at 295–98, 93 S.Ct. 1038; *United States v. Freeman,* 302 F.2d 347, 350–52 (2d Cir. 1962), *cert. denied,* 375 U.S. 958, 84 S.Ct. 448, 11 L.Ed.2d 316 (1963); *Johnson v. Baltimore & O. R. Co.,* 208 F.2d 633 (3d Cir.), *cert. denied,* 347 U.S. 943, 74 S.Ct. 639, 98 L.Ed. 1091 (1954); 3A *Wigmore on Evidence* §§ 896–906 (Chadbourne ed. 1970); *McCormick on Evidence* § 38 (2d ed. 1972); Ladd, *Some Observations on Credibility: Impeachment of Witnesses,* 52 Cornell L.Q. 239, 249–51 (1967); Ladd, *Impeachment of One's Own Witness—New Developments,* 4 U.Chi.L.Rev. 69 (1936).

**4.** F.R.Ev. 607 provides: "The credibility of a witness may be attacked by any party, including the party calling him."

**5.** *See, e. g., State v. Fronning,* 186 Neb. 463, 183 N.W.2d 920 (1971); Note, *Impeaching One's Own Witness in Nebraska,* 51 Neb.L.Rev. 352 (1971).

**6.** In the early medieval period,

proof was not an attempt to convince the judges; it was an appeal to the supernatural, and very commonly a unilateral act. The common modes of proof are oaths and ordeals. It is adjudged, for example, in an action for debt that the defendant do prove his assertion that he owes nothing by his own oath and the oaths of a certain number of compurgators, or oath-helpers. The defendant must then solemnly swear that he owes nothing, and his oath-helpers must swear that his oath is clean and unperjured. If they safely get through this ceremony, punctually repeating the right formula, there is an end of the case; the plaintiff, if he is

hardy enough to go on, can only do so by bringing a new charge, a criminal charge of perjury against them. They have not come there to convince the court, they have not come there to be examined and cross-examined like modern witnesses, they have come there to bring upon themselves the wrath of God if what they say be not true.

F. Maitland, *The Forms of Action at Common Law* 15 (1962). A party's oath-helpers were ordinarily his relatives and did in fact stand as guarantors, if not of his veracity, at least of the justice of his position. *See* 1 M. Bloch, *Feudal Society* 124–25 (1961). If the poet of *The Song of Roland* may be credited, a party's guarantors risked even more than their souls: the thirty kinsmen who vouched for Ganelon, Roland's betrayer, were promptly hanged after his champion was slain in a judicial duel. *See The Song of Roland* (J. Bedier ed.). "The Trial of Ganelon".

Compurgation by oath was viewed as unsatisfactory even in the time of the Year Books. With the centralization of justice in the royal courts, oath-helpers no longer faced the discipline of having to live with their opponents—and the parish priest—in a small community. They were increasingly hired off the streets, and eventually from the ranks of court ushers. *See* S.F.C. Milsom, *Historical Foundations of the Common Law* 51 (1969). It is somewhat bewildering to consider today a rule whose historical predecessor seems to have been discredited for almost 600 years.

**7.** *See* Ladd, *Impeachment of One's Own Witness—New Developments,* 4 U.Chi.L.Rev. 60, 70–72 (1936).

completely unrealistic to imagine him as the guarantor of his witness's veracity in every respect. Indeed, the policy of the State of New York, which permits impeachment by a prior inconsistent statement provided the declaration is written and subscribed, or sworn to, is, in fact, inconsistent with the general principle of "voucher".

The true basis of the New York statute appears to be a fear that, if a party were permitted to impeach his own witness freely with prior inconsistent statements, the New York rule excluding such statements as hearsay would be undermined.[8] This principle appears to establish some minimal rational basis for the rule. But we must note that here, as in *Chambers*, the hearsay danger in permitting a witness to be questioned on the stand *regarding his own prior statement* is minimal. Moreover, in many cases it seems most arbitrary to make the ability to impeach a witness on the basis of a prior inconsistent statement depend on the mere accident of who called the witness to testify.[9] It is clear, therefore, that the rule against impeaching one's own witness may, under some circumstances, be of so little weight that a serious impairment of the right to present a defense cannot be justified.

C. *Lipinski's interest in a fair trial.* We cannot conclude, however, that the application of the New York voucher rule in this case seriously impaired Lipinski's ability to present an effective defense. Lipinski was not placed in the dilemma so often engendered by the rule, where helpful testimony can be secured only by foregoing the very threat of cross-examination that alone guarantees the veracity of a hostile witness. Even if Bendetson had testified in accordance with his taped conversation, Lipinski would have established only that Starrish alone had seen the umbrella in Lipinski's shopping bag. But the state was quite prepared to rely exclusively on Starrish's testimony. It is hardly unfair to discourage Lipinski from calling Bendetson for the sole purpose of showing that Bendetson could add nothing to what Starrish had said.

■ This conclusion is strengthened by the consideration that, under an aspect of New York law not challenged here, an out-of-court declaration introduced to impeach a witness cannot be used as substantive evidence. See N.Y.C.P.L. 60.35(2); *Fitzgibbons Boiler Co. v. National City Bank*, 287 N.Y. 326, 39 N.E.2d 897, *motion den.*, 287 N.Y. 843, 41 N.E.2d 169 (1942). Accordingly, even had Judge Cacace permitted Lipinski to question Bendetson regarding the taped conversation, the jury would probably have been instructed that any inconsistencies that might be revealed could be considered only to neutralize Bendetson's testimony, and not to raise doubts concerning the veracity of Starrish. Of course, it is possible that such instructions might have made no impact on the jury. But Lipinski can hardly complain that the application of the voucher rule prevented him from circumventing a rule of evidence that not even he has challenged.

■ Finally, we underscore that Lipinski was amply warned that he would not be permitted to impeach Bendetson and that he was endangering his case by eliciting testimony that confirmed Starrish's story. Lipinski chose to proceed despite the trial judge's repeated cautioning. The fact that Bendetson gave damaging testimony that Lipinski could have kept from the jury entirely had he heeded the judge's warnings does not constitute a denial of due process.

8. *See* Schatz, *Evidence—Impeachment of One's Own Witness: Present New York Law and Proposed Changes*, 27 Cornell L.Q. 377, 385–86 (1942).

9. *See Chambers v. Mississippi*, 410 U.S. at 297–98, 93 S.Ct. 1038.