Carol **TAYLOR**, Petitioner-Appellant,

v.

Phyllis **CURRY**, Respondent-Appellee.

Nos. 1024, 1187, Dockets 82–2193, 81–2098.

United States Court of Appeals, Second Circuit.

Argued March 15, 1983.

Decided June 7, 1983.

888

Darrell K. Fennell, The Legal Aid Society, Federal Defender Services Unit, New York City, for petitioner-appellant.

Susan L. Yarbrough, Asst. Atty. Gen., State of N.Y., New York City (Robert Abrams, Atty. Gen., State of N.Y., Gerald J. Ryan, Asst. Atty. Gen., State of N.Y., New York City, of counsel), for respondent-appellee.

Before MANSFIELD, MESKILL and NEWMAN, Circuit Judges.

MESKILL, Circuit Judge:

Carol Taylor appeals from judgments of Judge Duffy dated January 9, 1981 and Chief Judge Motley dated March 19, 1982, both Judges of the United States District Court for the Southern District of New

York, dismissing Taylor's petitions for habeas corpus relief.[1] Petitioner claims that the state trial court violated her Sixth and Fourteenth Amendment right to present a full defense by ordering, on grounds of attorney-client privilege, that a draft separation agreement be excluded from evidence at her second criminal trial. Although we find error in this evidentiary ruling, petitioner was not deprived thereby of a fair trial. Accordingly, we affirm the judgments of the district court dismissing the petitions for habeas corpus relief.

## BACKGROUND

On the evening of March 13, 1976, Herbert Taylor was murdered in his Far Rockaway, New York, bungalow. After several months of investigation, Taylor's wife Carol was arrested by local authorities and was charged with second degree murder, criminal solicitation and conspiracy to murder her husband.[2] At trial, the prosecution suggested three possible motives for the murder. The first motive emerged from a classic "lover's triangle," focusing on the existence and intensity of a lesbian relationship between petitioner and her lover, one Elizabeth Taylor (not a relative of Herbert and not the actress). According to the state, Carol Taylor arranged for the murder of her husband to liberate herself from an unhappy marriage and to pursue more fully a lesbian relationship with Elizabeth.

The second motive advanced by the state was petitioner's fear that her husband would use the homosexual relationship as leverage to gain custody of the couple's two children. Testimony at trial revealed that the decedent apparently was aware of his

1. Judge Duffy's judgment was entered on January 9, 1981. While an appeal was pending, petitioner moved to withdraw her appeal in order to file an expanded habeas corpus petition. A stipulation of withdrawal without prejudice was signed by the parties and approved by this Court on June 25, 1981, see App. for Petitioner at 99, and reinstatement was subsequently allowed (Order of Sept. 15, 1982). Petitioner filed a subsequent expanded habeas petition later in 1981. Chief Judge Motley denied the second petition on March 19, 1982. Taylor appeals from both adverse rulings.

2. Elizabeth Taylor, petitioner's alleged paramour, was also indicted and tried as a co-defendant in connection with Herbert Taylor's murder. Elizabeth was convicted and sentenced to concurrent terms of twenty five years to life on the murder charge, zero to twenty five years on the conspiracy count and zero to seven years on the solicitation charge. In this habeas petition we are concerned only with the claim of Carol Taylor.

wife's lesbian affair and that Carol was visibly upset at his discovery. Finally, the state posited a financial motive—Carol was the sole beneficiary of life insurance policies totalling $134,700.

The state offered the testimony of petitioner's brother, Robert Rozell, who stated that approximately one week before the killing Carol offered him $10,000 to arrange for Herbert's demise. Rozell also testified that two or three days before the murder he overheard Carol ask their sister Barbara to accompany her to the Far Rockaway bungalow to determine if Herbert had been killed. Finally, Rozell testified that seven months after the murder, in October 1976, Carol stated that "[w]ell, if everybody keeps their mouth shut there will be $10,000 in it for everybody." Trial Tr. at 1827. Barbara Rozell, petitioner's sister, substantially corroborated her brother's testimony. Barbara also related that two or three days before Herbert's death, she overheard a phone conversation between Carol and Elizabeth Taylor in which they discussed the murder scheme.

Additional damaging testimony was elicited from Anthony and Theresa Pasquarelli, friends of Carol Taylor. The Pasquarellis each testified that on or about March 1, 1976, approximately two weeks prior to Herbert's death, Carol visited their New York home. They stated that Carol was distraught when she arrived and, during a conversation in their kitchen, she related that Herbert was aware of the lesbian relationship and that she was fearful he would use this homosexual affair as leverage to gain custody of their children. The Pasquarellis testified that after voicing her concerns, Carol offered Anthony Pasquarelli $10,000 to arrange for the murder of her husband. According to the Pasquarellis, Carol proposed to make partial payment before Herbert's death and to tender the balance after she had received the insurance proceeds. Wendy Condoleo, a friend of Theresa Pasquarelli, who apparently was

babysitting for the Pasquarelli children that night and was present in the kitchen during this conversation, substantially corroborated the Pasquarellis' testimony.

Petitioner's first trial ended in a mistrial after the court learned that the prosecution had solicited an informant, Barbara Rozell, to obtain uncounseled incriminating evidence from her sister *after* Carol had been arrested. The court found Barbara Rozell to be an agent of the state and declared a mistrial after ruling that petitioner's Fifth Amendment rights had been violated by the state's surreptitious conduct.

At the second trial petitioner defended principally on the theory that the Pasquarellis, the Rozells and Wendy Condoleo were lying in an effort to protect Anthony Pasquarelli and Robert Rozell from complicity in the murder. The jury was not persuaded—petitioner was convicted on each of three counts and sentenced to concurrent prison terms of twenty five years to life on the murder charge, eight and one-third to fifteen years for conspiracy, and two and one-third to seven years for the criminal solicitation charge. The conviction was unanimously affirmed by the Appellate Division on April 28, 1980, *People v. Taylor*, 74 A.D.2d 177, 427 N.Y.S.2d 439 (2d Dep't 1980). Leave to appeal to the New York Court of Appeals was denied on June 20, 1980. *People v. Taylor*, 50 N.Y.2d 1005, 431 N.Y.S.2d 1044, 409 N.E.2d 1013 (1980). These habeas petitions followed.

## DISCUSSION

At the outset, we note that petitioner has satisfied the exhaustion requirements of the federal habeas statute, 28 U.S.C. § 2254 (1976), because she has limited her appeal to an issue that had been raised and rejected by the appropriate state courts. *See Rose v. Lundy*, 455 U.S. 509, 518–19, 102 S.Ct. 1198, 1203–04, 71 L.Ed.2d 379 (1982).[3] We proceed to consider that sole claim.

---

**3.** Petitioner has withdrawn several additional claims that were raised in her two habeas petitions before Chief Judge Motley and Judge Duf-

fy, some of which were not exhausted in the state courts. The exhaustion requirements of 28 U.S.C. § 2254 (1976) are satisfied when the

Petitioner asserts that the state trial judge violated her Sixth and Fourteenth Amendment right to present a full defense when he excluded the draft separation agreement from evidence at the second trial. This document, prepared by Herbert's attorney in March 1976 after consultation with both spouses, contained a provision that Carol would retain custody of the children and that Herbert would be permitted reasonable visitation rights. *See* App. for Petitioner at 29, 34–35.

The prosecution had introduced the draft separation agreement into evidence at petitioner's first trial, ostensibly to support the theory that Taylor killed her husband out of fear that she would be removed as sole beneficiary of his life insurance policies after the couple's separation and divorce. After the mistrial, the prosecution shifted its litigation strategy and decided not to introduce the separation agreement.

After the state presented its case at the second trial, defense counsel sought to introduce the draft agreement as relevant to the question of motive. The state promptly objected, asserting that the document was inadmissible under New York's attorney-client privilege because the decedent never waived his right to preserve the confidentiality of the draft agreement. The trial judge agreed and accordingly ordered the draft agreement excluded from petitioner's second trial.

Taylor argues in her habeas petition that the separation agreement would have substantially undermined the state's theory of the case. According to petitioner, two major motives advanced by the prosecution— the intensity of her love for Elizabeth and the fear that her husband would use the lesbian relationship to gain custody of their children—were effectively refuted by the separation agreement. She points out that the draft agreement showed that Herbert was amenable to their separation and that he was willing to relinquish custody of their children. Hence, Taylor asserts that there was no compelling reason to kill Herbert because the separation agreement permitted her to maintain custody of the children and liberated her to pursue the lesbian love affair. Petitioner maintains that had the jury known these facts the testimony of the Pasquarellis, the Rozells and Wendy Condoleo would have been substantially discredited.

██ The state concedes on appeal that it was "disingenuous" for the prosecutor to introduce the draft agreement at the first trial and then to object when defense counsel sought to admit the document at the subsequent trial. We agree. The prosecutor is charged with a dual responsibility—he must vigorously represent the interests of his client, the state, but he must also act zealously to ensure that justice is done. *See Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); *United States v. Berry,* 627 F.2d 193, 198 (9th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981).[4] A prosecutor does a disservice to the state and to his profession when he makes "disingenuous" objections to the admission of probative evidence.

██ The trial court's decision to exclude the draft agreement from evidence at the

---

petitioner withdraws unexhausted claims. *See Rose v. Lundy,* 455 U.S. 509, 520, 102 S.Ct. 1198, 1204, 71 L.Ed.2d 379 (1982).

**4.** The Supreme Court highlighted this dual responsibility in *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935):

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor— indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* at 88, 55 S.Ct. at 633.

second trial was error. Although the State of New York has an important interest in preserving the confidentiality of attorney-client communications, *see* N.Y.C.P.L.R. § 4503(a) (McKinney Supp.1982),[5] that interest dissipated when the agreement was introduced at the first trial and became part of the public record. *See Lanza v. New York State Joint Legislative Committee On Governmental Operations,* 3 N.Y.2d 92, 98, 164 N.Y.S.2d 9, 13, 143 N.E.2d 772, 775, *cert. denied,* 355 U.S. 856, 78 S.Ct. 85, 2 L.Ed.2d 64 (1957). The draft agreement was relevant to refute the state's theory of motive and should have been admitted at the second trial.

■ The finding of error does not, however, determine the outcome of this appeal. Erroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue *only* where petitioner can show that the error deprived her of a *fundamentally fair* trial. *See Chambers v. Mississippi,* 410 U.S. 284, 302–03, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973); *Lipinski v. People,* 557 F.2d 289, 292 (2d Cir.1977), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978); *see also Nettles v. Wainwright,* 677 F.2d 410, 415 (5th Cir.1982); *Gale v. Harris,* 580 F.2d 52, 54 (2d Cir.1978) (per curiam), *cert. denied,* 440 U.S. 965, 99 S.Ct. 1515, 59 L.Ed.2d 781 (1979).

■ The concept of "fundamental fairness" is sometimes an elusive one. Where an erroneous evidentiary ruling is made, and relevant evidence is thereby excluded, the reviewing court's duty is to determine whether the excluded evidence was *material* to the presentation of the defense:

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. *It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.* This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976) (emphasis added) (footnotes omitted).[6]

■ After reviewing the state trial record, we are satisfied that admission into evidence of the draft separation agreement at the second trial would not have "create[d] a reasonable doubt [regarding petitioner's guilt] that did not otherwise exist."

5. Section 4503(a) provides:

(a) Confidential communication privileged; non-judicial proceedings. Unless the client waives the privilege, an attorney or his employee, or any person who obtains without the knowledge of the client evidence of a confidential communication made between the attorney or his employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication, in any action, disciplinary trial or hearing, or administrative action, proceeding or hearing conducted by or on behalf of any state, municipal or local governmental agency or by the legislature or any committee or body thereof. Evidence of any such communication obtained by any such person, and evidence resulting therefrom, shall not be disclosed by any state, municipal or local governmental agency or by the legislature or any committee or body thereof. The relationship of an attorney and client shall exist between a professional service corporation organized under article fifteen of the business corporation law to practice as an attorney and counselor-at-law and the clients to whom it renders legal services.

N.Y.C.P.L.R. § 4503(a) (McKinney Supp.1982).

6. Our task is to determine whether the exclusion of evidence was an error of constitutional dimension, not the more narrow inquiry whether a constitutional error has been shown to have been harmless beyond a reasonable doubt, *Chapman v. California,* 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967).

*Id.* Although we are troubled by the prosecutor's conduct, we are satisfied that petitioner was afforded a fundamentally fair trial.

The state did emphasize at the second trial that Taylor's fear of losing custody of her children was a prime motive for the murder. In fact, in his summation the prosecutor improperly argued that there was no agreement on custody. App. for Petitioner at 89–90. To be sure, the draft separation agreement would have been relevant to refute this theory. However, the attorney who drafted this document, Mr. Anderson, did testify at the second trial and indicated that he met with Mr. and Mrs. Taylor in early March 1976 to discuss their impending separation. He further testified that the question of custody was discussed at this meeting and that "[i]t was suggested that the wife would have custody." App. for Petitioner at 66. Anderson also testified that he prepared a draft separation agreement at the behest of his client, Mr. Taylor, shortly after the March meeting. The trial judge granted counsel's request to mark the draft agreement for identification but refused to allow the document into evidence.

Although the draft agreement may have been better evidence, the clear import of Anderson's testimony was that Carol Taylor would retain custody of her children during the separation period. Elizabeth Taylor strengthened this inference when she testified about the substance of a conversation she had with Carol shortly before Herbert's death. According to Elizabeth, Carol indicated that she had met with Herbert and his attorney to consider a separation agreement and that the couple agreed that she (Carol) would retain custody of the children. Therefore, the draft agreement itself would add little to refute the theory that Carol killed Herbert to ensure that she would retain custody of the children. Furthermore, the agreement was not signed by the parties and hence could be changed. Additionally, the existence of the separation agreement would not prevent Herbert from using the lesbian relationship at some later time to seek custody of the children. Although Carol arguably was "safe" for the moment, Herbert's knowledge of her homosexual affinity was a constant reminder of her precarious parental status. When viewed against the totality of the evidence presented, *see United States v. Agurs,* 427 U.S. at 112, 96 S.Ct. at 2401, we are satisfied that the jury would not have harbored a reasonable doubt about petitioner's guilt had the draft separation agreement been admitted into evidence at the second trial.

■ Defense counsel argues that the testimony of the Pasquarellis, the Rozells and Wendy Condoleo would have been substantially discredited if the jury was permitted to examine the draft agreement. We are not persuaded. As noted earlier, the testimony at trial clearly pointed to the existence of a draft agreement and to the conclusion that Carol would retain custody of the children. The jury observed first hand the testimony of the Pasquarellis, the Rozells and Wendy Condoleo and found these witnesses to be credible. We are not free to second-guess these credibility judgments.

Our analysis finds support in *Grochulski v. Henderson,* 637 F.2d 50 (2d Cir.1980), *cert. denied,* 450 U.S. 927, 101 S.Ct. 1383, 67 L.Ed.2d 358 (1981), where we were asked to decide whether petitioner was denied a fair trial when the state judge, relying on N.Y. Crim.Proc.Law § 60.35 (McKinney 1981), ruled that the defense could not impeach its witness through use of a prior inconsistent statement. Defense counsel sought to introduce a transcribed statement given by the witness to a county prosecutor which contradicted testimony introduced by the prosecution and which substantially discredited the witness' testimony.

On appeal, we reviewed the disputed statement and concluded that:

[T]he trial court's refusal to allow the ... statement to be used for impeachment purposes [did not] by itself deprive[ ] Grochulski of a fair trial, because *Chambers* and *Welcome* [*v. Vincent,* 549 F.2d 853 (2nd Cir.1977) ] do not countenance the setting aside of a state

evidentiary rule such as N.Y.Crim. Proc.Law § 60.35 simply because it seems fairer to the defendant to abrogate the rule. As explained above, *Chambers* and *Welcome* require such a result only under limited circumstances not present here. *See Lipinski v. New York,* 557 F.2d 289 (2d Cir.1977). Our review of the totality of the evidence and the circumstances of the trial court's rulings leave us with the conviction that ... Grochulski received a fair trial.

*Id.* at 56 (footnote omitted); *see Lipinski v. People,* 557 F.2d at 292.

Petitioner urges that the facts of this case are more analogous to *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974), and *Klein v. Harris,* 667 F.2d 274, 289 (2d Cir.1981), where convictions were set aside due to erroneous evidentiary rulings by the state court. We are not persuaded. Careful review of those decisions reveals that the evidence excluded was manifestly more probative than the draft agreement at issue here.

In *Davis,* the prosecution obtained "crucial" testimony from a seventeen year old male who at the time of trial was on probation by juvenile court order after having been adjudicated a delinquent for burglarizing two cabins. Prior to trial, the prosecutor moved, pursuant to Alaska Rule of Children's Procedure 23 and Alaska Statutes § 47.10.080(g) (1971), for a protective order to prevent reference during cross-examination to the witness' juvenile record. Defense counsel vehemently objected, arguing that the juvenile adjudication seriously undermined the witness' credibility. According to the defense, by limiting cross-examination in this manner the defendant would be effectively foreclosed from exposing a strong motive for the witness to testify falsely, *i.e.,* to shift the focus of the criminal investigation from himself to the defendant.

The state trial court, consistent with Alaska's public policy against disclosure of juvenile adjudications, granted the prosecution's motion for a protective order. After granting *certiorari,* the Supreme Court ruled that petitioner's Sixth and Fourteenth Amendment right of confrontation outweighed the state's interest in preserving the confidentiality of juvenile records. In reaching its conclusion, the Court noted that the accuracy and truthfulness of the witness' testimony were "key elements in the State's case against petitioner." *Id.* at 317. Carol Taylor's right of confrontation was not diminished by the evidentiary ruling here.

Our decision in *Klein v. Harris,* 667 F.2d 274 (2d Cir.1981), another case relied on by petitioner, provides another example of a situation where habeas corpus relief is warranted on constitutional grounds. In *Klein,* the witness who implicated petitioner in a felony murder indicated to defense counsel after testifying that he had lied on the stand due to pressure from the assistant district attorney. *Id.* at 279. When defense counsel recalled the witness and sought to elicit this testimony, the witness refused on Fifth Amendment grounds to answer any questions relating to his conversation with defense counsel. Over the objection of counsel, the state trial judge upheld the witness' exercise of his Fifth Amendment privilege and further ruled that prior testimony of the witness would not be stricken from the trial record notwithstanding the witness' refusal to answer additional questions.

The petition for habeas corpus was granted and on appeal to this Court, we affirmed, holding that the state trial judge either should have directed the witness to testify to the substance of his conversation with defense counsel or should have stricken the entire testimony of the witness. The Court further found this error to be of constitutional dimension, implicating petitioner's Sixth Amendment right of confrontation, and determined that a new trial was warranted given the importance of the witness' testimony.

The draft separation agreement does not remotely approach in probative value the evidence excluded in *Davis* and *Klein.* Here, five witnesses implicated Taylor in the criminal conspiracy. The clear import

of Attorney Anderson's testimony was that a separation agreement had been drafted and that the parties had tentatively agreed that petitioner would have custody of the Taylor children. The unsigned draft agreement, while probative, was cumulative in nature and its admission into evidence would not have created "a reasonable doubt that did not otherwise exist" concerning petitioner's guilt.

The judgments of the district court are affirmed.