**NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, Plaintiff,**

**v.**

**Margaret HECKLER, as Secretary of the United States Department of Health and Human Services, Cesar A. Perales, as Commissioner of Social Services of the State of New York, David Axelrod, as Commissioner of Health of the State of New York, and Michael Finnerty, as Director of the Budget of the State of New York, Defendants.**

**No. 82 Civ. 4550 (WCC).**

United States District Court, S.D. New York.

Aug. 28, 1984.

Rosenman Colin Freund Lewis & Cohen, New York City, for plaintiff; Joseph Zuckerman, Peter F. Nadel, Edward S. Kornreich, Edward Himmelfarb, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for State defendants; Melvyn R. Leventhal, Deputy First Asst. Atty. Gen., Judith A. Gordon, Marion R. Buchbinder, Asst. Attys. Gen., New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendant Marga-

ret Heckler; Frederick Lawrence, Asst. U.S. Atty., Annette H. Blum, Regional Atty.-Region II, Elizabeth Dusaniwskyj, Asst. Regional Atty., Dept. of Health and Human Services, New York City, of counsel.

OPINION AND ORDER

CONNER, District Judge.

New York City Health and Hospitals Corporation ("HHC"), which operates fourteen New York City hospitals, commenced the instant action against the Secretary of the Department of Health and Human Services ("the Secretary") and various New York State officials ("the State defendants"), challenging the method by which the State calculated the 1982 Medicaid reimbursement rate paid to three of HHC's hospitals. Specifically, plaintiff seeks declaratory and injunctive relief that would invalidate use of a specific component of the New York State Plan for Medical Assistance ("the State Plan").

This is the second such action brought by HHC. The first action, which challenged the validity of the same provision on a variety of grounds similar to those presented here, followed a tortuous procedural path leading ultimately to a dismissal by Judge Brieant of this Court. *See New York City Health and Hospitals Corp. v. Blum, et al.,* No. 80 Civ. 5495 (CLB) (slip op. July 6, 1981), *appeal dismissed,* 678 F.2d 392 (2d Cir.1982), *on remand,* No. 80 Civ. 5495 (CLB) (slip op. July 21, 1982). That dismissal was subsequently affirmed by the Court of Appeals for the Second Circuit. 708 F.2d 880 (2d Cir.1983). Because the framework and operation of the complex State Plan have been described in considerable detail in the various opinions cited above, some familiarity with the prior proceedings is presumed.

I. BACKGROUND

The State of New York has elected to participate in the Medicaid program, through which the federal government contributes funds to assist states in providing health care for the poor. Pursuant to the Medicaid Act, 42 U.S.C. §§ 1396 *et seq.,* hospitals that offer care to Medicaid-eligible patients receive reimbursement funded jointly by federal and state authorities. Each participating state is required to adopt a State Plan for Medical Assistance, which establishes a methodology for determining a reimbursement rate. These plans must be approved by the Secretary and must provide for payments that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 42 U.S.C. § 1396a(a)(13)(A).

New York's State Plan, set forth at 10 N.Y.C.R.R. Part 86–1, is prospective in nature. In other words, the per diem rate that each hospital receives for treating Medicaid patients is determined in advance, on the basis of a formula derived from the costs actually incurred by that hospital in a previous year. The year in which the hospital renders services is referred to as the "rate year"; the year from which the costs are analyzed to compute the rate-year payments is the "base year." The instant action involves reimbursement rates established for services rendered in rate year 1982. The per diem rate was derived from costs incurred in base year 1980.

A. *The State Plan*

New York's in-patient hospital reimbursement methodology was designed to provide a workable procedure for determining which of a hospital's base year costs are attributable to efficient and economical operations and which are attributable to inefficiency and waste. This determination is used to predict with a reasonable degree of accuracy the costs each hospital will incur during the rate year if it is efficiently and economically operated. Anderman Aff. at ¶ 6.

Computation of 1982 payment rates under the State Plan involved several steps that may be summarized, briefly and simply, as follows: First, the State recorded the total actual costs that each hospital incurred in base year 1980. From this fig-

ure, amounts in excess of certain cost ceilings were subtracted; the remainder represented the hospital's reimbursable costs. These costs were multiplied by an inflation factor, and the adjusted total was then divided by the number of patient-days the hospital recorded in the base year. This yielded a per diem amount that each hospital was to receive for each day of inpatient service it rendered to Medicaid patients in the rate year.

At issue here is the validity of one of the three ceilings placed on base-year costs. As explained in greater detail in the opinions cited above, participating hospitals were placed in peer groups for purposes of calculating average costs. To the extent that a given hospital exceeded 105% of the peer group average in providing "routine" and "ancillary" services in the base year,[1] the difference was disallowed in calculating the rate year reimbursement figure. HHC does not challenge the routine or ancillary cost limitations; it challenges instead a third ceiling that was designed to eliminate costs attributable to excessively prolonged hospitalizations in the base year. The limitation imposed under the challenged provision of the State Plan is referred to as the "length of stay" or "LOS" ceiling.

The LOS disallowance represents the difference between each hospital's average length of stay and an average length of stay calculated for the hospital's peer group. Base year patient data for each hospital were collected and patients were categorized according to such factors as age, diagnosis and the presence or absence of surgery. An average length of stay for each of the categories was then computed. This was the hospital's "actual average LOS," and it was compared with the peer group average, or "expected average LOS" for each category. A given hospital was deemed to have had a LOS excess in the base year to the extent that its actual average exceeded its expected average by more than one-half day.

The figure obtained above represented the average over-stay of each patient, and was multiplied by the number of patients to yield the total number of excess days for the base year. That number was multiplied by the average routine per diem cost incurred by the hospital in the base year, to obtain the excess cost figure. Thus, the LOS disallowance reduced each hospital's total actual base-year costs by the amount of the routine costs associated with excessive patient days.

In addition to establishing this reimbursement methodology, the 1982 State Plan provides an appeal procedure under which hospitals have an opportunity to justify base-year costs that have been deemed excessive and have therefore been excluded from the rate year per diem reimbursement figure. The procedure, which is set forth in 10 N.Y.C.R.R. §§ 86–1.16 and 86–1.17, affords hospitals a more individualized review of their base-year costs than is feasible at the time rates are established under the general formula. Upon a proper showing that the hospital's peculiar patient mix or case mix caused all or part of the cost in excess of the ceilings, or upon a showing that the hospital has brought its actual average LOS within one-half day of the expected average for any consecutive twelve-month period between the base year and the rate year, a retrospective recomputation of the per diem rate is performed by the Department of Health ("DOH"). Final determinations rendered on the rate appeals are reviewable in state court under Article 78 of the New York Civil Practice Laws and Rules ("C.P.L.R."). Each of the three hospitals involved in this litigation have filed appeals that are currently pending, and each hospital's appeal includes a challenge to the LOS disallowance.

B. *PSRO's*

The gravamen of HHC's attack against the LOS provision of the State Plan is that

1. Routine costs are the "hotel like" expenses of caring for patients, including those for food, fuel, and laundry. *HHC v. Blum*, 708 F.2d at 882. Ancillary costs, on the other hand, are the costs of care required by particular patients, including operating room, X-ray, laboratory and pharmaceutical expenses.

the State's determination that certain 1980 patient days were excessive conflicts with determinations made by federally-mandated Medicaid review organizations that the same patient days were necessary and appropriate. These organizations, called Professional Standards Review Organizations ("PSRO's"), were established by Congress in order to assure that Medicaid funds would be paid only for necessary, high-quality medical services.[2] Comprised of physicians, PSRO's were designed to review the appropriateness of in-patient care provided to Medicaid beneficiaries on a case-by-case basis. They were required to consider, *inter alia,* medical necessity and appropriate length of stay.

Under the Medicaid Act, states must provide for review of treatment provided to Medicaid patients. 42 U.S.C. § 1396a(a)(30). This requirement may be satisfied by the PSRO's or by a hospital's own utilization review committee ("URC"). The Bureau of Hospital Services of DOH negotiated agreements with PSRO's to review treatment of Medicaid patients in specific hospitals. Under 42 U.S.C. § 1320c–7(c) (Supp. III 1979), the judgments of these PSRO's were deemed "conclusive for purposes of payment under the Medicaid Act."[3] In other words, hospitals were not permitted to seek reimbursement for days of care the PSRO's determined were unnecessary.

Of the three hospitals involved in this litigation, only Bellevue and Coney Island Hospitals had PSRO's reviewing the treatment of Medicaid patients in 1980. Harlem Hospital had no PSRO, but did have an in-house URC which reviewed the medical necessity and appropriateness of treatment and then notified the Department of Social Services of unnecessary days of care provided to Medicaid patients.[4] Osten Aff. at ¶¶ 4, 11. Cummings Aff. at ¶ 7. No claim for services rendered to a Medicaid patient during 1980 was submitted unless the URC found that each day of the hospital stay was necessary. *Id.* at ¶ 8.

C. *The Complaint*

HHC alleges that it is a public benefit corporation that operates fourteen hospitals in the City of New York, that it is the primary provider of medical services to the poor and indigent of the City and that it is the largest provider of Medicaid Services in the country; among its hospitals are Bellevue, Coney Island and Harlem Hospitals, all acute care hospitals providing a full range of in-patient services. Lawler Aff. at ¶¶ 2–3. HHC complains here that in calculating the LOS disallowance for the 1982 rate year, the State defendants deemed excessive many base-year days of hospitalization that had previously been reviewed and approved for payment by PSRO's.[5] On the basis of this apparent inconsistency, HHC asserts a variety of claims. First, it alleges that the defendants' use of the LOS penalty is invalid and unlawful because it conflicts with the conclusive authority of PSRO's to determine the appropriate length of stay of Medicaid patients. Count I of Amended and Supple-

2. The PSRO Act was repealed prospectively in 1982. Pub.L. No. 97–248, § 143. The repeal has no effect on the PSRO determinations at issue here. Pl's Mem. at 6, n. 2.

3. In 1977, Congress added 42 U.S.C. § 1320c–7(c), which provides that PSRO determinations "shall constitute the conclusive determination ... for purposes of payment" and that "no reviews with respect to those determinations shall be conducted, for purposes of payment" by the State.

4. PSRO's could and did delegate their review functions to the hospitals' own URC's. When such delegations were made, the PSRO's were responsible for monitoring the performance of the URC's. In 1980, the Kings County PSRO had, in fact, delegated its review authority for Coney Island Hospital to Coney Island's URC, and the New York County PSRO had, in fact, delegated its review authority to Bellevue Hospital's URC. Osten Aff. at ¶¶ 8–9; Lawler Aff. at ¶¶ 8–12.

5. HHC alleges that in the 1982 rate year, the three hospitals in question "suffered an LOS penalty based upon allegedly excessive stays amounting to some 55,000 days incurred at those three hospitals in 1980. Of these, more than 12,000 had been approved by the relevant PSRO's in the 1980 base year." Complaint at ¶ 33.

mental Complaint. Second, HHC argues that as a result of this unlawful disallowance, reimbursement for services rendered by its hospitals in 1982 was and is being significantly reduced. This reduction, in effect, denies the hospitals payment for costs which are reimbursable under the Medicaid Act in that they "must be incurred by efficiently and economically operated facilities." Thus plaintiff asserts a violation of the Medicaid Act. Count II of the Amended and Supplemental Complaint.

HHC has also alleged: (1) that use of the LOS disallowance imposes a double penalty on the hospitals in question because the same routine costs disallowed by virtue of PSRO disapproval in the base year are again disallowed in the rate year, Count III; (2) that the LOS penalty takes no account of fixed routine costs which do not vary with patient volume or length of stay, Count IV; and (3) that the State Plan fails to specify the methods and standards used to set payments, and that it allows the State defendants unbridled discretion, Count V. With respect to the Secretary, HHC contends that her approval of the State Plan was arbitrary and capricious, Count VI.

Plaintiff's complaint seeks injunctive and declaratory relief. HHC asks this Court to declare that the LOS disallowance and the State defendants' implementation of that provision are unlawful and invalid. The complaint does not seek recovery for reimbursement paid at the 1982 "illegal" rate; such a remedy would be barred by the Eleventh Amendment. HHC does ask the Court "to ensure that the State conforms to federal law *in the future* by ceasing its use of the unlawful LOS penalty in its reimbursement of those claims that have not yet been submitted and those submitted but not yet paid." Pl's Reply Mem. at 60.

The matter is now before the Court on cross-motions for summary judgment. The State defendants argue that the Court should dismiss the action on the ground that the controversy is not yet ripe for judicial review, since the pending administrative appeals may provide HHC with complete relief. They urge the Court, in the alternative, to abstain from exercising its jurisdiction in light of available state remedies and the potential for interference with a complex system developed in an area of substantial state concern. The state defendants argue, finally, that the Eleventh Amendment bars the Court from awarding monetary damages and that plaintiff cannot receive indirectly that relief which it cannot seek directly. The Secretary reiterates the arguments raised by the State defendants and denies that she acted arbitrarily in approving the State Plan. For the reasons below, I agree with defendants that the matter is not yet ripe for judicial review and that it should therefore be dismissed.

*Discussion*

The merits of the arguments presented here are best understood in light of *New York City Health and Hospitals Corp. v. Blum,* 708 F.2d 880 (2d Cir.1982) (*"HHC v. Blum"* ), wherein the Second Circuit Court of Appeals rebuffed HHC's challenge to the facial validity of the LOS disallowance. With respect to the alleged conflict with the conclusive authority of PSRO's, the Court recognized that in the hypothetical case of a hospital serving only Medicaid patients in the base year, any LOS disallowance in the rate year could be "ostensibly inconsistent with the PSRO's statutorily created 'conclusive authority.'" *Id.* at 885. The court also determined, however, that the LOS disallowance was not in facial conflict with PSRO authority since it had "purposes intimately woven into the fabric of the State Plan viewed as a whole and [was] not limited to lengths of stay of Medicaid patients." *Id.* at 886. Furthermore, the Court observed that if the LOS formula was reasonable and if the PSRO and State Plan operated as intended, it could be assumed that the LOS disallowance stemmed solely from excessive lengths of stay of *non*-Medicaid patients. Absent any factual showing of an actual conflict, the Court found no basis upon which to reject this assumption. Thus, it is

apparent from *HHC v. Blum* that any successful challenge to the State's use of the LOS disallowance must, at the least, rest upon a showing that the potential conflict with the conclusive authority of PSRO's has, in fact, been realized in a specific instance.

█ This is the showing HHC asserts it has now made. HHC suggests, based upon the number of days disallowed under the LOS formula for Bellevue, Coney Island and Harlem Hospitals, that concrete evidence of a direct conflict between the PSRO Act and the State Plan is now manifest. However, assuming that plaintiff's statistics are accurate and that patient days approved for payment by PSRO's in the base year were disallowed in the rate year under the LOS component of the State Plan, the State's determination is not yet final. Defendants have contended, without apparent contradiction, that the LOS disallowance incurred by each of the three hospitals in question is subject to substantial adjustment or complete elimination at the administrative appeal stage. In my view, this potentiality is fatal to plaintiff's assertion that a justiciable controversy now exists.

The Supreme Court recognized in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1966) that injunctive and declaratory judgment remedies are discretionary, and that courts have traditionally been "reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution." *Id.* at 148, 87 S.Ct. at 1515. According to the Supreme Court, the basic rationale underlying the ripeness doctrine is to

> prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Id.* In *Abbott Laboratories,* the Court articulated a two-pronged test for determining whether a matter is ripe for review; the relevant inquiries are whether the issues tendered are appropriate for judicial resolution and whether the parties would encounter hardship if relief were denied. I am convinced that neither portion of the test has been satisfied by HHC here.

On the record before it, the Court can determine how many patient days were prospectively disallowed under the LOS formula at each of the hospitals in question. The defendants readily concede, however, that the LOS formula, which is based on averages, has certain deficiencies by nature in that it fails to account for the special circumstances of individual hospitals. Therefore, the formula may not yield an accurate indication of how many days were actually unnecessary. To account for special circumstances, the State defendants rely on the administrative appeal process, taking into consideration information submitted by the hospitals and individual surveys performed by personnel from the Bureau of Hospital Services of DOH. Anderman Aff. at ¶ 72; Osten Aff. at ¶ 2.

Steven Anderman, the Deputy Director for Health Care Financing for DOH, describes the appeal process as follows: Appeals must be commenced within 120 days after the facility receives its initial computation sheet. The DOH staff then performs a bureau review, and either affirms or revises the rate. The disposition of the bureau review is final unless the facility requests a hearing, setting forth the factual issues to be resolved. A rate review officer determines whether factual issues exist, and if they do, a hearing is provided in conformity with the provisions of New York's Public Health Law and the Administrative Procedure Act. The rate review officer submits a recommendation to the Commissioner of Health for final approval or disapproval, and for recertification of the rate where appropriate. All final determinations are reviewable in State court under Article 78 of the New York Civil Practice Law and Rules. Anderman Aff. at ¶¶'s 73–74. As previously noted, each of the hospitals in question has an appeal

pending, and each hospital has sought review of the LOS disallowance used to calculate its 1982 reimbursement rate. These appeals are currently at the bureau review stage. *Id.* at ¶ 83.

Analysis of the "appeal packets" filed by Bellevue, Coney Island and Harlem Hospitals, see Ex's N, O and P to Anderman Aff., reveals that each hospital has sought relief for two categories of days disallowed under the LOS formula. The first category consists of "Type I" days, which the hospitals apparently provided because they were unable to discharge patients for reasons beyond their control. For example, each hospital has sought reimbursement for "Bureau of Child Welfare" days, which are provided to children admitted for evaluation of suspected maltreatment and for protection. The hospitals could not discharge these children until authorized to do so by the Bureau of Child Welfare or by Order of the Family Court. HHC acknowledges that DOH has granted relief for these days in the past. Ex. N to Anderman Aff. at 14.

Each hospital has also sought relief for Alternate Level of Care ("ALOC") days disallowed under the LOS formula. These days were provided to patients who no longer required hospitalization but who could not be released until nursing home beds could be located. If the Bureau of Hospital Services determines that a hospital has complied with the State's discharge planning rules and regulations, it will recommend that any disallowance attributable to ALOC days be waived. Osten Aff. at ¶ 7.

"Type II" days are those which the hospitals believe were medically necessary but which were unaccounted for by the LOS formula because they reflect patient or case mixes peculiar to specific hospitals. All three hospitals, for example, have asserted that they have an unusually high volume of severe emergency admissions. Bellevue and Harlem Hospitals also cite higher than average numbers of complex tuberculosis cases. *See* Ex's N, O and P to Anderman Aff.

According to Anderman, if Bellevue and Coney Island Hospitals are granted full relief on their Type I days alone, their base year LOS disallowances will be eliminated entirely and their 1982 reimbursement rates will be recalculated. If Harlem Hospital is granted relief on both types of days, its disallowance will also be completely eliminated. Anderman Aff. at ¶ 82. Thus, it is apparent that the pending administrative action may well remove the very factual basis the Court of Appeals required in *HHC v. Blum.* In light of this distinct possibility, I can only conclude that the issue whether the LOS provision conflicts with conclusive PSRO authority is inappropriate for judicial resolution at this time.

Moreover, just as HHC is currently unable to demonstrate that a conflict between the LOS disallowance and the PSRO Act has finally been realized, it is unable to demonstrate that it has been denied reimbursement for costs that must be incurred by efficiently and economically operated facilities, in violation of the Medicaid Act. First of all, HHC has not attempted to make a factual showing of its actual reasonable costs and, as the Court of Appeals made clear in *HHC v. Blum,* a conflict between the LOS disallowance and the PSRO Act does not lead inescapably to the conclusion that there has been a denial of reasonable cost reimbursement. More important for purposes of the ripeness consideration, however, is the fact that even if HHC could establish its reasonable costs for 1982, it cannot show that it has been denied reimbursement for those costs because the number of days used to compute the ultimate LOS disallowance has not yet been derived, and the final 1982 reimbursement rate is, as yet, unknown. Absent a final rate determination and a concomitant showing of concrete injury to HHC, none of the claims based on denial of reimbursement for reasonable costs is ripe for judicial review.

■ Under the circumstances, I deem it inappropriate to proceed with consideration of the remaining claims. The LOS disal-

lowance is but one small component in a complex reimbursement methodology that has taken years to develop and continues to evolve. The provision in question here "has purposes intimately woven into the fabric of the State Plan," 708 F.2d 886, and its proper application requires the expertise of numerous State health care agencies. Accordingly, this is an area in which the federal courts should tread lightly if they must intrude at all. I will not intervene to determine whether there has been technical compliance with federal Medicaid regulations where pending administrative proceedings may well eliminate the possibility that non-compliance could have injured HHC.

I am not persuaded by HHC's argument that federal court intervention is justified at this time because DOH has delayed in processing the appeals filed on behalf of HHC's three hospitals. While DOH's delays are indeed disturbing, the record does not establish that they are "unconscionable," Pl's Reply Mem. at 72, nor does it demonstrate "administrative nonfeasance" sufficient to convince the Court that resort to the administrative remedy is futile or will cause irreparable injury. *Id.* at 74.[6]

The interests in preserving judicial resources and avoiding piecemeal litigation also counsel against entertaining any of HHC's claims at this time. The Secretary has represented and plaintiff has not denied that in addition to the administrative appeals now pending before DOH, plaintiff has filed an action in the State court on grounds similar to those raised here. Def. Statement Pursuant to Rule 3(g) at ¶ 16. In the State court, HHC will not be barred by the Eleventh Amendment from seeking to recover those reimbursements "illegally" withheld by virtue of the LOS provision, assuming of course that it can ultimately establish the existence of a conflict with the PSRO Act and a denial of the reasonable costs its hospitals incurred. HHC can litigate its other claims in the same forum. The Court of Appeals noted in *HHC v. Blum* that "to the extent that this action is a stalking horse for a state action for damages, we frown upon resort to the equitable remedy of a declaratory judgment in a federal court." 708 F.2d 880, 885 n. 4. The instant action appears to be just such a "stalking horse," and under these circumstances, and I do not believe that reviewing plaintiff's claims would constitute an appropriate use of federal judicial resources.

For all the reasons stated above, plaintiff's complaint is dismissed. SO ORDERED.

6. The Anderman affidavit provides a partial explanation for the delay. Anderman avers that under recent legislation, the 1983 rate appeals must be processed within six months of their receipt by DOH and thus the 1983 appeals are being processed simultaneously with the 1982 appeals.

HHC's argument that the Court should entertain its claims now because the appeal process affords it no opportunity to challenge the validity of the methodology is equally unavailing. With respect to the alleged conflict between the LOS disallowance and the PSRO Act, the Court of Appeals has already determined that the methodology is valid on its face. Any challenge based on the denial of reimbursement for reasonable costs must rest on a factual showing that cannot yet be made, and I decline to entertain the remaining claims absent some assurance that HHC has been injured.