**Stuart HUBER, Petitioner,**

v.

**Sunny SCHRIVER, Superintendent, Wallkill Correctional Facility, Respondent.**

**No. 98–CV–0017 (NGG)(WDW).**

United States District Court, E.D. New York.

April 17, 2001.

---

Stuart Huber, Huntington, NY, pro se.

*MEMORANDUM AND ORDER*

GARAUFIS, District Judge.

Pro se Petitioner Stuart Huber brings this application for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254. The underlying facts of the trial are set forth in great detail in Magistrate Judge William D. Wall's Report and Recommendation ("R & R") below and need not be repeated here. I repeat portions of the post-conviction procedural history for context only.

On May 29, 1992, Petitioner was convicted after a jury trial of robbery in the first degree. He was sentenced to a term of incarceration of four to twelve years. On May 16, 1996, Petitioner moved pursuant to New York Criminal Procedure Law § 440.10 to vacate his conviction on the grounds of newly discovered exculpatory evidence and *Brady* violations. His motion was denied.

On December 22, 1997, Petitioner timely filed the instant petition for a writ of habeas corpus, asserting five grounds for relief: (1) *Brady* violations, (2) failure to establish guilt beyond a reasonable doubt, (3) erroneous evidentiary rulings, and (4) improper jury instructions. The matter was referred to Magistrate Judge Wall for a report and recommendation. Since then Petitioner has been released from prison on probation. Petitioner filed specific objections to the R & R on November 27 and December 8, 2000. I have reviewed de novo the objections, the record, and Magistrate Judge Wall's R & R, *see* 28 U.S.C. § 636(b)(1)(B); FED. R. CIV. P. 72(b), and find Petitioner's arguments unconvincing.

■ Magistrate Wall concluded that this court retains jurisdiction over Petitioner's application for a writ of habeas corpus because he was "in custody" at the time he filed his petition. *See infra* at 4 (citing *Spencer v. Kemna*, 523 U.S. 1, 11, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998)). I agree

with that statement and add only that the controversy is not mooted by Petitioner's release because being "on parole" satisfies the "in custody" requirement of 28 U.S.C. § 2254(a). *See Jones v. Cunningham*, 371 U.S. 236, 242–43, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

Regarding the substantive issues, I am in full agreement with and hereby adopt the magistrate's analysis of Petitioner's habeas claims. *See* 28 U.S.C. § 636(b)(1). Petitioner's objections to the R & R are without sound legal or factual support. Accordingly, for the reasons set forth in the R & R reproduced below,[1] Petitioner's application for a writ of habeas corpus is denied. In addition, because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court is directed to close the case.

SO ORDERED.

WALL, United States Magistrate Judge.

On May 29, 1992, after a jury trial, petitioner was convicted of robbery in the first degree and was sentenced to an indeterminate term of imprisonment of four to twelve years. (T at 437–39; S at 37–38.[2]) He appealed his conviction to the New York Supreme Court, Appellate Division, Second Department. In a Decision and Order dated February 14, 1994, the Appellate Division unanimously affirmed petitioner's conviction. *See People v. Huber*, 201 A.D.2d 583, 609 N.Y.S.2d 806 (N.Y.App.Div.1994). Thereafter, by certificate dated April 24, 1994, leave to appeal to the New York Court of Appeals was denied. *See People v. Huber*, 83 N.Y.2d

---

1. I have made only minor formatting changes to the R & R.

2. The facts set forth in this Report are taken from the trial transcript ("T"), the pretrial

hearing transcript ("H") the sentencing minutes ("S"), and exhibits annexed to the Respondent's Affidavit in Opposition to the habeas petition.

872, 613 N.Y.S.2d 133, 635 N.E.2d 302 (1994). Petitioner did not seek a writ of certiorari in the United States Supreme Court.

In 1995, while he was incarcerated, petitioner claims that he was told by another inmate, Richard Katz, that a third person, Charles Kroll, had "confessed" to the robbery for which petitioner was convicted. (Pet. Mem. at 19.) By motion dated May 16, 1996, petitioner moved the Nassau County Court, pursuant to New York State Criminal Procedure Law § 440.10, to vacate the judgment of conviction. The motion was denied without a hearing by Order dated December 20, 1996. Petitioner applied for leave to appeal that Order, and leave was denied by Decision and Order dated May 6, 1997. *See People v. Huber*, No. 97–01160 (N.Y.App.Div.1997). On December 22, 1997, petitioner filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Respondent Sunny L. Schriver, Superintendent of Walkill Correctional Facility, moved, pursuant to 28 U.S.C. § 2244(d), to dismiss the application as time-barred, and that motion was denied by District Judge Hurley in a Decision and Order dated February 3, 1999. Respondent opposes petitioner's application for habeas relief. Respondent concedes that each of Petitioner's claims is exhausted, but contends that some aspects of the claims are procedurally barred, that some do not present constitutional questions, and that they are all without substantive merit. (Resp.Aff.¶¶ 68–69.)

By letter dated October 13, 2000, Petitioner informed the Court that he has been released from prison, but still wishes to pursue his habeas application. Despite petitioner's release from prison, this Court retains jurisdiction over petitioner's habeas application. The "in custody" requirement of the habeas statute is satisfied if, as here, petitioner was incarcerated at the time the petition was filed. *See Spencer v. Kemna*, 523 U.S. 1, 11, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).

## FACTUAL BACKGROUND

### 1.) *The King Kullen Robbery on March 14, 1991:*

On March 7, 1991, at approximately 8:30 p.m., Jeffrey Fischler and Kenan Karatas, employees of the King Kullen supermarket at 5 Cold Spring Road in Syosset, observed a man whom they later identified as petitioner walk into the store. (T at 4–6, 16–17, 39–40, 44–45, 48–49.) The man walked back and forth near the front office courtesy counter. (*Id.* at 40, 45–46.) Mr. Fischler followed him around for three or four minutes, and was, at times, within arm's length of him. (*Id.* at 6, 11–12.) The man was wearing a cowboy hat and carrying a gun in a shoulder holster. (*Id.* at 5–6, 40.) Mr. Fischler noted that he was white, about 6'4" to 6'5" in height and between 25 and 30 years old, with light brown hair and hazel eyes, wore boots, did not have a mustache, and weighed between 225 and 250 pounds. (*Id.* at 5–7, 12, 27–29.) The man went to the checkout line, where Mr. Karatas was bagging groceries. (*Id.* at 41.) As Mr. Karatas stared at his gun, the man flashed open his jacket and claimed to be a police officer. (*Id.*)

One week later, on March 14, 1991, at approximately 8:30 p.m., Messrs. Fischler and Karatas again saw a man whom they later identified as petitioner in Aisle 1 of the same King Kullen supermarket. (*Id.* at 12, 16–17, 42, 44–45.) Mr. Karatas observed him standing near the front office courtesy desk. (*Id.* at 45–46.) Mr. Fischler noticed that he was wearing a baseball cap and what appeared to be a "fake" looking mustache. (*Id.* at 13, 28.)

At about 8:30 p.m., Alice Quinn, a cashier at the supermarket, went to the store's

courtesy desk to tally money. The man approached Ms. Quinn, pulled out a gun, and gave her a paper bag and a note that re id "I have a gun. Please be quiet and put all the money in the bag." (*Id.* at 70–73.) He held the gun in his left hand. (*Id.* at 85–86.) Ms. Quinn complied with his demand. (*Id.* at 74.) She had an unobstructed view of the robber under good lighting conditions for three or four minutes, during which time she noticed that he was wearing a fake mustache, a baseball cap, and a tan jacket. (*Id.* at 71–73, 75–77, 80, 86.) He demanded that Ms. Quinn return the note. She did so; he left the store; and the police were called. (*Id.* at 75, 77.)

Detective Michael Kuhn and Officer Thomas Salvato of the Nassau County Police Department arrived and interviewed Ms. Quinn, who told them that the robber had been wearing a "phony" mustache, and that he was brown-haired, dark-eyed, "very tall" (approximately 6′3″), white, about 200 pounds, with a big nose. (*Id.* at 73, 78, 80, 86, 88, 130–32, 134–35)

Subsequently, someone from the Suffolk County Police Department told Detective Bartlett of the Nassau County Police Department that Suffolk County had, two years earlier, arrested petitioner for the robbery of a King Kullen supermarket in Suffolk County, under circumstances similar to the robbery of the Syosset King Kullen[3]. (H at 15, 38.) Detective Bartlett conveyed the information about the earlier King Kullen robbery to Detective Kuhn. (*Id.* at 15.) The Suffolk County Police Department gave Detective Kuhn a photograph of petitioner, in which he was not wearing a mustache. (*Id.* at 13, 42.) The

Nassau County detectives prepared two photo packs, each of which contained a photograph of petitioner and photos of five other men who resembled petitioner. In one array, petitioner and the "fillers" were clean shaven; in the other, a mustache was added to petitioner's photo and the fillers were men with mustaches. (*Id.* at 16–17.)

Detective Kuhn showed the photo packs to Mr. Fischler, who identified petitioner from both arrays as the person he had seen in the store on the night of the robbery, stating that "[H]is face is perfect and it is positively the same person." (Resp. Exh. 1 at 54; H at 19.) Detective Kuhn also showed the photo packs separately to Ms. Quinn and Mr. Karatas. (H at 21.) Ms. Quinn identified petitioner from both photo packs as the person who robbed her, stating that "His face and eyes are definitely those of the man who robbed me." (Resp. Exh. 1 at 56; H at 21–22.) Mr. Karatas "believed" that the man he had seen in the store was either number four or number six in the first array. (H at 23–24, 38–39.) Petitioner was, in fact, number six in that array. (*Id.* at 39.)

Detective Kuhn arrested petitioner on March 24, 1991, and Detective James Bennett participated in the arrest. (T at 139–40; H at 24; Resp. Exh.1 at 241.) Detective Kuhn ascertained that petitioner was 6′5″ tall, weighed about 225 pounds, had light brown hair and hazel eyes. (T at 140.) Petitioner told Detective Kuhn that he is right handed. (*Id.* at 158.) On the date of his arrest, petitioner was placed in a lineup with five fillers who resembled him. (*Id.* at 140–41; H at 25.) Ms. Quinn, Mr. Fischler and Mr. Karatas separately

---

**3.** Petitioner argues that the details of his prior conviction are irrelevant to this petition. (Pet. Reply ¶ 10.) Evidence of the prior conviction was not admitted at trial, although it did come up without objection by petitioner in his § 440.10 motion hearing. (H at 15, 42.) We find that although the introduction at that hearing of details of petitioner's former conviction would render those details generally applicable, the former conviction is not relevant to any of the specific issues presented here, and is not necessary to revisit that conviction for the purposes of this report and recommendation.

viewed the lineup. (T at 16–17, 44, 79, 143–44.) Ms. Quinn recognized petitioner as the man who had robbed her on March 14, 1991, and provided Detective Bartlett with a statement confirming that she had identified petitioner in the lineup as the person who had robbed her at gunpoint in the Syosset King Kullen store on March 14, 1991, and who had given her a note that read, "I have a gun. Be very quiet and put all the money in a bag." (Resp. Exh. 1 at 242.)

Mr. Fischler and Mr. Karatas identified petitioner as the man they had seen in the store on March 7, and also identified him as the man they saw in the store on March 14 at the time of the robbery. (T at 16–17, 44, 143–44.) They both gave Detective Bennett a statement that they recognized petitioner in the lineup as the person involved in the March 14 robbery of the Syosset King Kullen. (Resp. Exh. 1 at 241–42.)

### 2.) *Petitioner's indictment and trial:*

Petitioner was indicted on August 1, 1991, and a pretrial Wade/Dunaway hearing was held. (Resp.Aff.¶ 43.) The County Court of Nassau County found that the police had probable cause to arrest petitioner and that the identification procedures were conducted non-suggestively. (*Id.*) Accordingly, the County Court denied petitioner's motion to suppress identification testimony. (*Id.*)

At the trial, the defense put Susan Fisher, then petitioner's fiancé and now his wife, on the stand. She testified that petitioner could not have been at King Kullen on either March 7 or March 14. On March 7, she testified, he had been at home sleeping, and on March 14 he was at home with her in their bedroom between 8:00 p.m. and 8:40 p.m. watching television. (T at 207–08, 211–112, 218.) She testified that, on March 14, he left their house about 8:35 or 8:40 to attend his weekly card game,

that she had never seen petitioner wear a fake mustache, cowboy boots, or a cowboy hat, and that he was right handed. (*Id.* at 211, 213, 217.) Ms. Fisher's two teenaged sons testified to the same facts. (*Id.* at 185, 200, 232.)

Leonard Slutsky testified for the defense that he was the host of a weekly card game at 20 Equestrian Lane in Huntington and that petitioner was a regular participant who had attended the game on March 14, although he had not attended on March 7. (*Id.* at 272–73, 275, 277, 279.) Slutsky said that petitioner had arrived at his house on March 14 between 8:55 p.m. and 9:05 p.m., the first person to arrive for the game. (*Id.* at 277, 279.) Slutsky stated that it was "not normal" for petitioner to be the first to arrive, and that Slutsky had never seen petitioner wear a false mustache, cowboy boots or a cowboy hat. (*Id.* at 274.)

Several other witnesses testified that petitioner had attended the card game and had arrived unusually early, that they had never seen petitioner wear a cowboy hat, cowboy boots, or a fake mustache, and that he was right handed. (*See generally id.* at 236–302 (testimony of Stuart Kern, Joel Gerald Ratzker, Peter Frank Cohn, Israel Brenner and Gregory Mazzeo).)

Petitioner was found guilty of robbery in the first degree and sentenced to a term of imprisonment of four to twelve years. (*Id.* at 437–39; S at 38.) He maintains that he is an innocent victim of mistaken identity, whose alibi should have been credited by the jury.

### 3.) *Charles Kroll:*

On or about April 17, 1991, the Nassau County Police Department received a complaint of assault and grand larceny from Nancy Hoelle. Detective Bennett, the same detective who arrested petitioner, went to her house in Oyster Bay to investi-

gate. Ms. Hoelle told Detective Bennett that her former boyfriend, Charles Kroll, had stolen her truck and had beaten her. (Resp. Exh. 1 at 242.) She showed Detective Bennett a pellet gun, a "stage" mustache, and what appeared to be a "practice" stickup note. She gave the detective a description of Kroll and a photograph. Respondent claims that Detective Bennett never took the mustache, note, pellet gun or anything else from Ms. Hoelle, (Resp. Aff. ¶ 37 (citing Resp. Exh. 1 at 243)), but petitioner claims that he did, (Pet. Mem. at 20, 23).

The date of Ms. Hoelle's complaint—April 17, 1991—was after petitioner's arrest on March 24, 1991, but before his indictment on August 1, 1991. After interviewing Ms. Hoelle, Detective Barrett did a computer search for "open crimes" in Nassau County wherein the description of the perpetrator matched that of Charles Kroll. (Resp. Exh. 1 at 243.) When he found nothing, he contacted the Suffolk County Second Squad and told them about Charles Kroll's description. (Id.) Suffolk County Detective Richard Neems told Bennett that he had an "open" robbery for which Kroll matched the description of the perpetrator, apparently the robbery of the Videoplex store in Centerport for which Kroll was later convicted. (Id.)

Detective Bennett never considered Kroll a suspect in the March 14, 1991 King Kullen robbery because he believed that Kroll's description did not match the description of the King Kullen perpetrator. (Id.) According to Detective Bennett, who has seen both Kroll and petitioner, Kroll is a white man with "steel blue" eyes, a thin, pointy nose, and hair darker than petitioner's. (Id. at 244.) Bennett compared this to petitioner's lighter hair and wider nose, and concluded that other than race and size (both men are quite tall), there is no resemblance between the two. (Id.)

A month after the King Kullen robbery, a video store in Suffolk County was robbed by a man described as a very tall white male, with light brown hair and medium complexion, who "threw a brown paper bag on the counter, and said something like, this is a holdup, and then told [the victim] to empty the registers." (Resp. Aff. Exh. 1 at 265–66.) He had what looked like a handgun in his waistband. (Id.) Charles Kroll subsequently confessed to the video store robbery and was imprisoned. (Id. at 263.)

In April 1993, Maurice Mongelli, an investigator with the Nassau County District Attorney's Office, contacted Nassau County Assistant District Attorney Gail Ennis, the ADA who had prosecuted petitioner at his trial, and told her that Victor Juliano, a private investigator, was working for petitioner. (Id. at 237.) Ennis followed up on the information that Mongelli had given her, and found that petitioner claimed to have spoken with another inmate—Richard Katz—who told petitioner that Charles Kroll had "confessed" to committing the March 14, 1991 King Kullen robbery. (Id.) On June 3, 1993, A.D.A. Ennis, in the presence of Detective Kuhn and others, interviewed Mr. Katz regarding petitioner's claim, and concluded that Kroll had never told Katz that Kroll had committed the King Kullen robbery. (Id.; Resp. Aff. ¶¶ 58–60.)

As noted earlier, petitioner moved to vacate his judgment of conviction based on his claims about Kroll's involvement, but that motion and petitioner's subsequent appeals were denied. The gravamen of petitioner's argument on his habeas application is his claim of mistaken identity. He contends that the likely perpetrator of the King Kullen robbery was Charles Kroll, and that, in any event, he has been wrongly convicted of a crime he did not commit.

### DISCUSSION

Application of AEDPA to Petitioner's Application:

Petitioner filed his application for a writ of habeas corpus on December 22, 1997. Thus, it is governed by the substantial amendments to the federal habeas statute, 28 U.S.C. § 2254, enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which took effect in April 1996. The applicable portions of the statute provide that:

> [A]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Terry Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000);[4] *Francis S. v. Stone,* 221 F.3d 100, 107–11 (2d Cir. 2000) (analyzing federal court's standard of review in analyzing claims previously adjudicated in state courts); *Clark v. Stinson,* 214 F.3d 315, 320–21 (2d Cir.2000) (same), *cert. denied,* —— U.S. ——, 121 S.Ct. 865, 148 L.Ed.2d 778 (2001).

The Supreme Court recently interpreted the new habeas statute in *Terry Williams,* finding that section (d)(1) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Terry Williams,* 120 S.Ct. at 1523 (O'Connor, J., writing for the Court). Justice O'Connor further found that, under the "contrary to" clause of section (d)(1), "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts," and that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle for this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

An application of this standard of review to the claims in this case leads to the conclusion that the petitioner cannot be granted habeas relief. In his application, petitioner raises five grounds for the relief sought: (1) the prosecution failed to disclose material pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) petitioner's guilt was not proven beyond a reasonable doubt; (3) the trial court deprived petitioner of state and federal constitutional rights when it admitted certain testimony by Alice Quinn; (4) the trial court improperly excluded evidence that the petitioner made exculpatory remarks when arrested, thus depriving him of a fair trial; and (5) the trial court's jury charge on identification improperly deprived the petitioner of a fair trial.

The pervasive theme of all petitioner's claims is that he is the innocent victim of mistaken identification. A federal habeas court is not, however, "charged with deter-

---

**4.** The case is cited with Williams' first name to distinguish it from *Michael Wayne Williams v. Taylor,* 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000), decided the same day as *Terry Williams* and involving a different subsection of AEDPA.

mining guilt or innocence, but rather with ensuring that a petitioner is not being held in violation of the Constitution," and petitioner's claims must be examined in keeping with that principle. *Harris v. Kuhlmann*, 115 F.Supp.2d 326, 328 (E.D.N.Y. 2000). For the reasons set forth *infra*, petitioner's claims do not warrant habeas relief.

### 1.) *Brady Claim:*

The *Brady* claim advanced by petitioner on his application has been adjudicated in a New York State Court. As noted *supra*, petitioner moved the Nassau County Court, pursuant to New York State Criminal Procedure Law § 440.10, to vacate the judgment of conviction, based on the State's failure to produce *Brady* material regarding Charles Kroll. Petitioner was represented by counsel on the motion, which was denied without a hearing by Order (Belfi, J.) dated December 20, 1996. (Resp.Aff.Exh. 2.) Thus, petitioner must show that the adjudication was contrary to, or unreasonably applied, clearly established Federal law, or that the decision was based on an unreasonable determination of the facts.

■ The clearly established federal law at issue here is *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which requires "disclosure only of evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *United States v. Bagley*, 473 U.S. 667, 674, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (quoting *Brady*, 373 U.S. at 87, 83 S.Ct. 1194). To obtain a new trial on the basis of an alleged *Brady* violation, a petitioner must demonstrate "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Caruso*, 2000 WL 1134359, *2, 2000 U.S.App. LEXIS 19796 at *7 (2d Cir. Aug. 9, 2000) (quoting

*Bagley*, 473 U.S. at 682, 105 S.Ct. 3375). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *See Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citing *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375).

■ The petitioner has made no such showing here. The gist of petitioner's *Brady* argument is that, before and during petitioner's trial, Detective Bennett and others had information about Charles Kroll, the "net effect" of which, if it had been disclosed to the jury, "raises a reasonable probability that its disclosure would have produced a different result" at trial. (Pet. Mem. at 28.) The "undisclosed evidence" referred to by petitioner includes Kroll's physical description, the holdup note and fake mustache seen by Detective Bennett in Ms. Hoelle's home, Kroll's *"modus operandi* in admittedly robbing a retail establishment in Suffolk County (the Videoplex Store), his residence near the King Kullen store, his midwestern [sic] clothing, and his classification in reports as an armed robbery suspect by the Nassau County Police Department." (*Id.*) These details, the petitioner asserts, "are all exculpatory materials which corroborates [sic] petitioner's alibi defense and would have given the jury pause to consider whether the state had established the identification element of the crime charged." (*Id.*)

Petitioner raised the same argument on his motion to vacate. In his opinion denying that motion, Justice Belfi found that petitioner had failed to demonstrate either that the government was in possession of the information alleged or that the information was, in fact, exculpatory. (Resp. Aff. Exh. 2 at 3.) "Moreover," the state judge concluded, "even if the information cited was actually *Brady* material, it failed to meet the appropriate standard for re-

view," that is, it fails to present a reasonable probability that the trial outcome would have been different if defendant had been in possession of the information. (*Id.*) This Court agrees, and finds Justice Belfi's ruling neither contrary to nor an unreasonable application of clearly established federal law.

Petitioner argues that it is "questionable whether the trial court evaluated the significance of the undisclosed evidence in this case under the correct standard," and that Justice Belfi erred by conducting "a series of independent materiality evaluation[s], rather than the cumulative evaluation required by [*Bagley*, 473 U.S. 667, 105 S.Ct. 3375]." (Pet. Mem. at 28, 40.) The petitioner points to no specific language in *Bagley* that requires a "cumulative evaluation," and the Court finds none, but assuming that such an analysis is necessary, this Court finds that Justice Belfi conducted an appropriate evaluation of the undisclosed information. Justice Belfi thoroughly reviewed various pieces of information that petitioner claimed to be exculpatory *Brady* material, and demonstrated why they did not, either individually or cumulatively, rise to the level of *Brady* material. We agree with that conclusion.

As to the specific details regarding Charles Kroll, petitioner argues, in essence, that if the jury had been aware of Kroll's description and criminal history, including the false mustache, pellet gun and practice note seen in Ms. Hoelle's house by Detective Bennett, there is a reasonable probability that the verdict would have been different. Justice Belfi, however, found a lack of any reasonable probability that "evidence of Kroll's involvement in a Suffolk County video store robbery would have resulted in a different verdict" for petitioner, observing that the differences between the two crimes were more significant than the similarities, which were limited to the fact that "what

the two crimes have in common [is] that they were both committed by a tall white man, with a gun." (Resp. Exh. 2 at 6.)

Nothing in that conclusion or the state court judge's other findings rises to the level necessary to grant habeas relief under 28 U.S.C. § 2254(d). The state court's application of the correct standard "eliminates any concern that its decision is 'contrary to' established federal law." *Francis S.*, 221 F.3d at 112. Nor was there an unreasonable application of the *Brady* standards under the facts presented here. It was not unreasonable for the State court to find, first, that the material was not *Brady* material, and, second, that if the information about Kroll did rise to the level of *Brady* material, the withholding of that material did not undermine confidence in the outcome of petitioner's trial. Indeed, this Court fully agrees with the state court rulings.

Even accepting as true all of petitioner's factual allegations in support of this argument (a proposition strongly contested by respondent), and assuming further that the information about Kroll would have been admissible at trial (also challenged by respondent), we are not convinced that the jury's awareness of the existence a tall white man who owned a false mustache and a pellet gun, and who wrote practice holdup notes, once lived in Texas, lived fairly close to the King Kullen, and robbed a video store in Suffolk County a month after the King Kullen robbery creates a reasonable probability that the verdict, which was apparently based on a high level of certainly in the eyewitnesses' identification of petitioner, would have been different.

In his reply memo of law, petitioner also claims that the County Court decision was based upon an unreasonable determination of the facts, but his argument in support of that claim is really no different from his general argument—that the information

about Kroll known to Detective Bennett can be imputed to the "prosecution team" and should have been disclosed. Moreover, the petitioner must meet a very strict standard in challenging the state court's determination of the facts. The AEDPA amendments require that, in a federal habeas proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Here, petitioner fails to rebut that presumption.

The bottom line is the same under either prong of 2254(d): there is no undermining of confidence in the outcome of petitioner's trial, and the strict standard of 28 U.S.C. § 2254 has not been met. The petitioner's arguments on this ground are without merit, and his application for a writ of habeas corpus on the ground that 'Brady material was not produced should be denied.

## 2.) *Insufficiency of Evidence Claim:*

■ As a second ground for habeas relief, the petitioner asserts that his guilt "was not established beyond a reasonable doubt where the identification testimony merely showed a resemblance and there was no other physical evidence connecting petitioner to the crime charged." (Pet. Mem. at 41–51.) In essence, petitioner argues that his conviction was based entirely on the eyewitness identification of him by Alice Quinn, and that her testimony was insufficient to form the basis of a conviction. (*Id.* at 42.) The Appellate Division considered the claim of insufficient evidence on petitioner's appeal, *see People v. Huber*, 201 A.D.2d 583, 609 N.Y.S.2d 806 (N.Y.App.Div.1994), and this Court's evaluation of the sufficiency of evidence at trial is limited to a consideration of whether the state court's decision was contrary to, or unreasonably applied, clearly established Federal law, or whether the decision was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). It was not.

■ A habeas petitioner relying on insufficiency of the evidence at trial " 'bears a very heavy burden.' " *Diaz v. Greiner*, 110 F.Supp.2d 225, 233 (S.D.N.Y.2000) (quoting *United States v. Rivalta*, 892 F.2d 223, 227 (1989)); *see also United States v. Strauss*, 999 F.2d 692, 696 (2d Cir.1993). The standard for habeas review of the legal sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).[5] All possible inferences that may be drawn from the evidence must be construed in the prosecution's favor. *See Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996). Here, petitioner asserts that his conviction was based entirely on Alice Quinn's eyewitness testimony, which he claims was simply wrong. (Pet. Mem. at 42.) It is unclear whether he is arguing that Quinn's pre-trial identification was also tainted by suggestiveness in the photo arrays or otherwise. If that is petitioner's argument, it must fail.

5. A few courts have held that the standard of review for insufficiency claims set forth in *Jackson* has been modified by AEDPA in 28 U.S.C. § 2254(d)(1). *See, e.g., Starr v. Mitchell*, 2000 WL 1529807, *3, 2000 U.S.App. LEXIS 25646, at *9–10 (6th Cir. Oct. 6, 2000), *cert. denied.* —— U.S. ——, 121 S.Ct. 1155, 148 L.Ed.2d 1016 (2001). The Second Circuit, however, continues to use the *Jackson* standard as "established Federal law, as determined by the Supreme Court of the United States," without reference to any "modification" by § 2254(d)(1). *See, e.g., Francis S.*, 221 F.3d at 114; *Stapleton v. Greiner*, 2000 WL 1207259, *12, 2000 U.S. Dist. LEXIS 11879, at *39 (E.D.N.Y. July 10, 2000).

■ The constitutionality of pre-trial identification procedures in a specific case poses a mixed question of fact and law, *see Snow v. Reid*, 619 F.Supp. 579, 581 (S.D.N.Y.1985) (citing *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982)), and a conviction "based on eyewitness identification will be set aside if the pre-trial identification procedure used was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Id.* (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). Here, Quinn gave the police a description of the robber immediately following the incident, and, on March 22, 8 days after the incident, she recognized petitioner as the man who robbed the King Kullen and picked him out from a photo array. (*Id.* at 79, 143.) She based her identification of him on her view of him for several minutes, in close proximity and good light. (*Id.* at 76–77.) Where an eyewitness had sufficient time to view the defendant, was attentive to detail, the interlude of time between the crime and the identification was relatively brief, and the witness evinces a high degree of certainty in making the identification, these factors taken together make an identification sufficiently reliable to satisfy the *Simmons* standard for admissibility. *See Snow*, 619 F.Supp. at 582. Here, all of the factors apply to Ms. Quinn's identification of petitioner.

Messrs. Fischler and Karatas testified to seeing petitioner in the grocery store around the time of the robbery, (T at 16, 45), and their testimony as well does not give rise to a "substantial likelihood of irreparable misidentification," *Simmons*, 390 U.S. at 384, 88 S.Ct. 967.

■ The weight to which the eyewitness testimony was entitled at trial was, of course, a question of fact for the jury. *Snow*, 619 F.Supp. at 582. Indeed, most of petitioner's argument rests on the suggestion that the eyewitness testimony was not credible and should not have been given enough weight to result in his conviction. Petitioner specifically asserts that the testimony of the defense witnesses was more credible than that of Ms. Quinn and the other prosecution witnesses. (Pet. Mem. at 43.) However, under both the state law cited by the Appellate Division and federal law, issues of credibility, as well as the weight to be given to evidence, are questions to be determined by the jury, which is "exclusively responsible for determining a witness's credibility." *Strauss*, 999 F.2d at 696. Federal habeas courts "'are not free to reassess the [fact-specific] credibility judgments by juries or to weigh conflicting testimony. On collateral review, [a federal habeas court] must presume that the jury resolved any questions of credibility in favor of the prosecution.'" *Vera v. Hanslmaier*, 928 F.Supp. 278, 284 (S.D.N.Y.1996) (quoting *Anderson v. Senkowski*, No. CV–92–1007, 1992 WL 225576, at *3 (E.D.N.Y.1992), *aff'd*, 992 F.2d 320 (2d Cir.1993)); *see also Marshall v. Lonberger*, 459 U.S. 422, 432–35, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983). Thus, to the extent that petitioner's claims challenge the witnesses' credibility or the weight of their testimony, they cannot provide a basis for habeas relief.

The Appellate Division held that, viewing the evidence in the light most favorable to the prosecution, it was legally sufficient to establish petitioner's guilt beyond a reasonable doubt on each of the elements of the crime [6] with which he was charged.

---

6. New York Penal Law § 160.15, the statute under which petitioner was convicted, states: "A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or

*Huber*, 609 N.Y.S.2d 806. We agree. Petitioner's argument that eyewitness identification is often unreliable notwithstanding [7], he has pointed to no law that renders such testimony per se insufficient. Nor does this Court find unreasonable the Appellate Division's holding that the various discrepancies complained of by the petitioner between his own description and Ms. Quinn's description of him "did not render her testimony infirm." It is clear, from the evidence in the record, that a rational factfinder could readily have found petitioner guilty beyond a reasonable doubt.

Thus, we find that the state court decision regarding the sufficiency of the evidence was not "contrary to" federal law, nor was it based on an unreasonable application of that law. The petitioner's arguments on this ground are without merit, and his application for a writ of habeas corpus on the ground of insufficiency of the evidence should be denied.

### 3.) *Constitutional Violations Based on Inadmissible Evidence:*

Petitioner, for his third ground, alleges that the "State Court deprived petitioner of his state and federal statutory and constitutional rights to confrontation, cross-examination, due process of law and a fair trial when it admitted (a) testimony of Quinn's prior descriptions of the robber and (b) allowed Quinn to testify that she had been 'taught' to study the features of a robber." (Pet. Mem. at 52.) This issue was presented on petitioner's appeal to the Appellate Division. That court did not specifically address the admissibility of evi-

dence issue, but held that "[c]ontrary to the defendant's contentions, we do not find that he was denied a fair trial." *Huber*, 609 N.Y.S.2d 806. The Court also found the contentions that it did not specifically address in detail to be "either unpreserved for appellate review ..., harmless ..., or without merit." *Id.*

 The admissibility of evidence in a state court proceeding is a matter of state law, and is not generally a ground for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–69, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Taylor v. Curry*, 708 F.2d 886, 891 (2d. Cir.), *cert. denied*, 464 U.S. 1000, 104 S.Ct. 503, 78 L.Ed.2d 694 (1983). The exception to this general rule occurs when an evidentiary error is so serious as to violate the petitioner's fundamental right to a fair trial. *See Estelle*, 502 U.S. at 71–72, 112 S.Ct. 475; *Stapleton v. Greiner*, 2000 WL 1207259, *8, 2000 U.S. Dist. LEXIS 11879, at *23 (E.D.N.Y. July 10, 2000). To constitute a denial of fundamental fairness sufficient to warrant habeas relief, evidence erroneously admitted at trial must be material in the sense of being a crucial, critical, highly significant factor. *See Jameson v. Wainwright*, 719 F.2d 1125, 1126 (11th Cir.1983), *cert. denied*, 466 U.S. 975, 104 S.Ct. 2355, 80 L.Ed.2d 827 (1984). The evidence complained of here does not rise to this level.

Here, the trial court permitted Alice Quinn to testify about the description of petitioner that she gave to the police shortly after the robbery occurred, and allowed her to testify that she came from "a family

---

another participant in the crime ...(4) [d]isplays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm ..."

**7.** The Court is well aware of the school of thought that eyewitness testimony is highly suspect. *See, e.g., United States v. Wade*, 388

U.S. 218, 228–35, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Nonetheless, such testimony has not been disallowed by the New York State Courts or by the United States Supreme Court and the simple fact that it was allowed at petitioner's trial and credited by the jury cannot form the basis for habeas relief.

of cops" and had discussed with family members what to do if she was ever the victim of a crime. (T at 76.)

 Petitioner claims that Alice Quinn's "account of a description of her assailant given to the police shortly after she was robbed" was inadmissible hearsay. (Pet. Mem. at 52–55.) The hearsay argument is simply wrong. As the respondent points out, the New York Court of Appeals has held that a victim's testimony, on the state's direct case, concerning her description of an assailant given shortly after the crime is admissible as non-hearsay to assist the jury in evaluating the victim's opportunity to observe her assailant at the time of the crime. *See People v. Huertas*, 75 N.Y.2d 487, 554 N.Y.S.2d 444, 553 N.E.2d 992 (1990) (cited in Resp. Mem. at 41). The *Huertas* court observed that although a detailed description would not "in itself, prove that the witness was able to observe accurately, the fact that such a description was given would tend to demonstrate that the particular conditions at least allowed the witness to make observations, whether accurate or not." *Id.* Petitioner's argument in his reply memorandum of law that the State did not use Quinn's testimony in his trial "for the purpose it was permitted to be used by the Court of Appeals," but instead offered it as expert testimony, is wholly without support in the record. (Pet. Reply at 76–77.) Thus, the hearsay prong of petitioner's inadmissible evidence argument fails.

The petitioner also complains that "the repetition of a prior description constitutes 'improper bolstering'" based on *People v. Trowbridge*, 305 N.Y. 471, 475, 113 N.E.2d 841 (1953), *superceded by* N.Y. CRIM. PROC. LAW § 60.25. (Pet. Mem. at 55.) "Bolstering" usually refers to the practice of "permitting an identification made by one witness to be corroborated by the testimony of another witness [usually a police officer] who merely testifies that the

identification did occur." *Snow*, 619 F.Supp. at 582. Here, the petitioner argues that Ms. Quinn's own testimony about her description of the robber given on the night of the robbery, in conjunction with her in-court identification of him, constituted improper "bolstering" of her eyewitness testimony.

Assuming that such testimony can be considered bolstering, petitioner's argument is without merit. As noted *supra*, the introduction of improper evidence does not amount to a violation of due process unless the evidence is "so extremely unfair that its admission violated fundamental conceptions of justice." *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.) (quoting *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)), *cert. denied*, 525 U.S. 840, 119 S.Ct. 101, 142 L.Ed.2d 81 (1998). Petitioner's bolstering claim does not rise to that level. "The concept of 'bolstering' really has no place as an issue in criminal jurisprudence based on the United States Constitution. It is at most a New York State rule ... [and v]iolation of that rule, as is so with regard to many such state court rules, does not rise to a constitutional level." *Id.; see also Taylor*, 708 F.2d at 891; *Diaz v. Greiner*, 110 F.Supp.2d 225, 234 (S.D.N.Y.2000) (citing *Gilmore v. Curry*, 523 F.Supp. 1205, 1208 (S.D.N.Y.1981)).

"Bolstering claims have been (expressly) held not to be cognizable on federal habeas review." *Diaz*, 110 F.Supp.2d at 234 (citing *Styles v. VanZandt*, 1995 WL 326445, *2, 1995 U.S. Dist. LEXIS 7428, at *5 (S.D.N.Y. May 31, 1995), *aff'd*, 101 F.3d 684 (2d Cir.), *cert. denied*, 519 U.S. 936, 117 S.Ct. 313, 136 L.Ed.2d 229 (1996)); *Vega v. Berry*, 1991 WL 73847, 1991 U.S. Dist. LEXIS 5675 (S.D.N.Y. Apr. 29, 1991) (noting that although bolstering is prohibited in various states, including New York, the practice is not forbidden by the Federal Rules of Evidence and is not sufficiently

prejudicial to deprive a defendant of his due process right to a fair trial); *Orr v. Schaeffer*, 460 F.Supp. 964, 967 (S.D.N.Y. 1978) ("[T]his Circuit has never regarded the practice [of bolstering] as inimical to trial fairness . . . ."). Thus, this prong of petitioner's argument is also without merit.

Petitioner also argues that admission of Quinn's testimony that she was "taught" to identify criminals deprived him of federal constitutional rights. (Pet. Mem. at 57–59.) This argument, like the bolstering argument, can succeed only if the evidence complained of was "so extremely unfair that its admission violated fundamental conceptions of justice." *Dunnigan*, 137 F.3d at 125. It was not. Ms. Quinn's testimony about being "taught that if anybody should threaten me, or try to get anything from me, I should be as calm as possible and try to get as much information about his face and appearance as I could," was probative of her mental and emotional state during the robbery. (T at 76.) As the trial judge instructed the jury, without petitioner's objection, a witness's mental and emotional state is a factor for the jury to consider in evaluating whether a witness had an adequate opportunity to observe and remember the perpetrator. (*Id.* at 409.) The testimony did not violate fundamental conceptions of justice, and does not provide a ground for habeas relief.

### 4.) *Exclusion of Evidence:*

As his fourth ground for habeas relief, petitioner claims that the "exclusion of evidence that, when petitioner was arrested, he promptly denied committing the robbery and accounted for his whereabouts at the time of the crime deprived petitioner of a fair trial, and his right to present his defense." (Pet. Mem. at 60.) During the cross-examination of Detective Kuhn, one of the arresting officers, defense counsel sought to elicit evidence that, at the time of his arrest, petitioner immediately pro-

claimed his innocence and presented his alibi. (T at 168, 171–72.) The state's objection on the ground that the comments were inadmissible self-serving hearsay was upheld.

As a threshold matter, the respondent argues that the petitioner did not raise this as a federal due process claim in state court, and it is thus unexhausted. (Resp. Mem. at 47 n. 50.) And, because it is now too late for petitioner to raise the claim in state court, it is procedurally barred from federal habeas review. *See Coleman v. Thompson*, 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The petitioner does not refute this in his reply brief, and the Court agrees that the claim fails on this ground alone.

Even viewing the claim on its merits, it must fail. As noted supra, a ruling by a state trial court on an evidentiary question is a matter of state law that poses no constitutional issue. *See, e.g., Estelle*, 502 U.S. at 67–69, 112 S.Ct. 475. Even erroneous state evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of habeas relief. *See Taylor*, 708 F.2d at 891. "Rather, erroneous exclusion of evidence warrants habeas relief only if the omission deprived the petitioner of a fundamentally fair trial." *McLean v. McGinnis*, 29 F.Supp.2d 83, 92–93 (E.D.N.Y.1998) (citing *Estelle*, 502 U.S. at 71–72, 112 S.Ct. 475), *aff'd*, 189 F.3d 461 (2d Cir.), *cert. denied*, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 490 (1999); *see also Friedgood v. Keane*, 51 F.Supp.2d 327, 347 (E.D.N.Y.1999). To decide whether an erroneous evidentiary ruling has denied a criminal defendant a fair trial, the court must determine whether the excluded evidence would have created "a reasonable doubt that did not otherwise exist." *Friedgood*, 51 F.Supp.2d at 347 (quoting *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

■ Here, the petitioner has failed to show error, much less constitutional error. The state trial court's preclusion of the proferred testimony was grounded in well-settled state evidentiary rules. Any testimony by Detective Kuhn about petitioner's declarations of innocence and offer of an alibi at the time of his arrest was properly excluded at hearsay that did not fall into any of the exceptions to the hearsay rule under New York law. Moreover, even if the testimony did qualify under one of the recognized exceptions, the petitioner's comments to Detective Kuhn lacked the indicia of reliability that would render them admissible. *See People v. Brensic,* 70 N.Y.2d 9, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987) ("Out of court statements introduced to prove the truth of the matters they assert are hearsay [that] may be received in evidence only if they fall within one of the recognized exceptions to the hearsay rule, and then only if the proponent demonstrates that the evidence is reliable.").

Petitioner's arguments that his comments to Detective Kuhn should have been admitted because: 1) self-serving defense statements cannot properly be excluded; 2) the prosecution waived its right to object because it introduced pedigree information about petitioner; 3) the "doctrine of completeness" required its admission; 4) the "consciousness of innocence theory" required its admission; 5) the "state of mind" hearsay exception applied; and 6) petitioner's statements to Kuhn should have been allowed to rehabilitate the testimony of petitioner's alibi witnesses are all without merit and provide no basis for finding that the exclusion of the evidence was erroneous as a matter of state law.

Even if the exclusion of the testimony was found to be erroneous, it would not support a grant of habeas relief, because the excluded evidence would not have "cre-ated a reasonable doubt that did not otherwise exist." *Agurs,* 427 U.S. at 112, 96 S.Ct. 2392. The gravamen of petitioner's argument in regard to this issue is the apparent claim that if the jurors had only known that at the time of his arrest he immediately offered the same alibi that was later corroborated by his alibi witnesses at trial, they would have credited the testimony of those witnesses, believed the alibi, and had a reasonable doubt about petitioner's guilt. Petitioner's argument thus rests largely on the idea that if he was present at the card game, he could not have been the robber. The record reflects that he could have been present at both locations. The robbery took place at about 8:30 p.m. and the police arrived at the scene at 8:34 p.m. (T at 70–71, 107–08, 132.) The participants in the card game testified that petitioner arrived at the game around 8:55 to 9:05 p.m., the first person to arrive, and unusually early for him. (*Id.* at 243, 257–58, 265, 273, 277, 279, 295, 297.) Detective Kuhn testified that it took him nine minutes to drive the five miles from the King Kullen to the site of the card game. (*Id.* at 149, 151.) Thus, petitioner could have robbed the King Kullen at 8:30, with plenty of time to drive to the card game and arrive "unusually early" at around 9 p.m. Of course, had the jury credited the testimony of Ms. Fisher and her sons, they would have found that petitioner was at home when the store was robbed, but there is simply no basis for a finding that knowledge of petitioner's proffer of his alibi at the time of his arrest would have affected the weight given by the jury to the Fishers' testimony, thus creating a reasonable doubt that did not otherwise exist. This Court finds that the proferred evidence was not at all likely to create in the minds of the jurors a reasonable doubt that otherwise did not exist, and this ground, for all the reasons set forth, cannot provide a basis for habeas relief.

### 5.) *Jury Charge Errors:*

Petitioner's last ground for relief is a claim that "the jury charge [in his trial] ran afoul of the Constitution and deprived petitioner of a fair trial." (Pet. Mem. at 63.) Specifically, the petitioner argues three "unconstitutional errors" in the instructions: 1) that the jury instructions in regard to the prosecution witnesses' out of court identifications of the petitioner amounted to improper bolstering when the state court told the jury that "the witnesses' memories were fresher" immediately following the crime than they were fourteen months later at the trial, (T at 412), that the supplemental instructions advising the jury that they could consider the testimony of Fischler and Karatas about the petitioner's presence in the King Kullen store on the night of March 7 allowed the jury to convict the petitioner based "only" on whether he was in the King Kullen on the earlier date, without reference to his presence in the store on the date of the crime, (*Id.* at 425; Pet. Mem. at 64–66), that the "charge changed the theory of the prosecution's case," (Pet. Mem. at 65).

 Like claims about inadmissible evidence, claims based on errors in jury instructions are matters of state law that do not ordinarily raise federal constitutional questions. *See McEachin v. Ross,* 951 F.Supp. 478, 483 (S.D.N.Y.1997) ("Mere questions of state law are not grounds for federal habeas relief.") (citing *Estelle,* 502 U.S. at 67–68, 112 S.Ct. 475). Errors in state jury charges are questions of state law and are therefore not reviewable on federal habeas corpus absent a showing that "the jury charge deprived the defendant of a federal constitutional right." *Id.*

(citing *Blazic v. Henderson,* 900 F.2d 534, 540 (2d Cir.1990)). The standard of review of state jury instructions in a habeas petition is "not whether 'the instruction is undesirable, erroneous or even universally condemned [but whether] the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Id.* (quoting *Wright v. Smith,* 569 F.2d 1188, 1191 (2d Cir.1978) (quoting *Cupp v. Naughten,* 414 U.S. 141, 146–7, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973))); *see also Blazic,* 900 F.2d at 541. Moreover, any allegedly erroneous jury instruction should be reviewed in light of the "well established proposition that a single instruction to a single jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp,* 414 U.S. at 146–47, 94 S.Ct. 396.

 As a threshold matter, petitioner argues generally that the jury charge resulted in a denial of due process, but he presents no "clearly established federal law" that the state court violated, and his claim must fail on that ground alone. Moreover, he is wrong in his allegation that the instructions were erroneous. Petitioner cites to no New York state cases that would support his claim that the instructions were erroneous, other than to claim that the overall "instruction on how the jury should evaluate the evidence offered by the State consisted on [sic] 'bare-bones', which in itself is a reversible error under state law." (Pet. Mem. at 66) (citing *People v. Gaines,* 80 A.D.2d 561, 435 N.Y.S.2d 346 (N.Y.App.Div.1981) (holding that in the context of that case, "the trial court's failure to give something more than a bare-bones charge on the sole issue of identification was error")).[8] Here, the

---

8. The respondent argues that the "barebones" claim should be "deemed exhausted" but is procedurally barred because petitioner did not present this claim in the state court. (Resp. Mem. at 58.) Nevertheless, we address it in our review of the overall context of the jury charge required by *Cupp.*

jury instructions regarding identification were far from "bare-bones" and contained no apparent errors.

The trial court instructed the jury that:

[T]he People have the burden of proving to your satisfaction beyond a reasonable doubt not only all the essential elements of the crime, but also that the Defendant Stuart Huber is the person who committed it.

Even if you are convinced beyond a reasonable doubt that a serious crime has been committed, this does not end your deliberations. You must also be satisfied beyond a reasonable doubt that the Defendant is the person who committed it.

You, the jury, are the sole judges of the rightness, indeed the certainty of the identification. You must, therefore, examine with great care all the evidence on the issue of identity, and as you have been instructed, you must be convinced beyond a reasonable doubt that the defendant is the right man, the man who, in fact, committed the crime. Otherwise you must acquit him.

In this case, ... the only evidence which establishes or tends to establish that the Defendant, Stuart Huber, is the actual perpetrator, that is the right man, is the testimony of the eye witnesses, Jeffery Fischler, Kenan Karatas, and Alice Quinn.

Apart from their testimony that the Defendant is the right man, there is no other evidence which identifies the Defendant as the perpetrator. In such case, the law requires that the jury be satisfied that identification testimony of eye witnesses is as certain as human recollection admits under the most favorable circumstances.

It becomes your duty to examine with great care all the circumstances surrounding the case. For example, what were the lighting conditions at the scene of the crime? What was the distance between the witness and the perpetrator? Did the witnesses have an unobstructed view of the perpetrator? Did they have an opportunity during the commission of the crime to observe and remember the facial features, the body size, the hair, skin color and the clothing of the perpetrator?

How much time lapsed during the commission of the crime? During this period of time, how long did the witnesses actually observe the perpetrator? Had any of the witnesses ever seen the perpetrator before? Did the perpetrator have distinctive features, which an eyewitness would be likely to remember and recall? What was the mental and emotional state of each witness?

These are some of the factors you must weigh in deciding whether the witnesses, in fact, had an opportunity to observe, and therefore, to remember the perpetrator.

(T at 407–409.)

■ The judge then went on to instruct the jury on the credibility of the witnesses, cautioning them repeatedly that if they had any reasonable doubt whether he was the person who committed the crime, they must acquit him. (*Id.* at 410, 411, 414.) He cautioned the jury that they "must be concerned that no mistaken identification should result in a conviction and punishment of the wrong man or of a Defendant innocent of the crime." (*Id.* at 411.) These identification instructions were clearly an "accurate statement of the law" according to New York's highest court. *See People v. Knight,* 87 N.Y.2d 873, 638 N.Y.S.2d 938, 662 N.E.2d 256 (1995) (citing *People v. Whalen,* 59 N.Y.2d 273, 464 N.Y.S.2d 454, 451 N.E.2d 212 (1983) for proposition that where a charge sufficiently apprised jury that reasonable doubt standard applied to identification, it

was not reversible error, even if "better practice" of giving "expanded identification charge" was not followed). In *Whalen,* the defendant argued that identification evidence is "always suspect, so that, when a trial involves a close question of identity, the jury should receive an instruction emphasizing the scrutiny to be given to such evidence." *Whalen,* 464 N.Y.S.2d at 456, 451 N.E.2d 212. At trial, the defendant in *Whalen* had unsuccessfully requested that the jury be instructed "that identification testimony should be received with caution and scrutinized with care." Instead, the trial court had charged, "It is the obligation of the People in this case to prove each and every element of each and every crime charged beyond a reasonable doubt, and this includes the identity of the defendant." *Id.* The New York Court of Appeals reviewed the charge, and found that although the "potential for inaccuracy in visual identification is well known to the legal community, and has been recognized by the Supreme Court (see *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149), . . . this court does not find legal error in the minimal charge that was technically correct. A Judge who gives a general instruction on weighing witnesses' credibility and who states that identification must be proven beyond a reasonable doubt has made an accurate statement of the law. No cognizable prejudice accrues to any party." *Whalen,* 464 N.Y.S.2d at 456, 451 N.E.2d 212. Here, the trial judge's identification charge went far beyond that required by New York courts, and presents no basis whatsoever for habeas relief.

Petitioner's claim that the instructions allowed for a conviction simply on the basis of his presence in the King Kullen the week prior to the crime is absurd, and his claim that the charge changed the State's theory of the case is completely unsubstantiated. Thus, petitioner's fifth ground for habeas relief is without merit, and his petition must be denied.

For the reasons stated, the undersigned recommends that the petition for habeas corpus be denied, inasmuch as none of the grounds advanced has merit under 28 U.S.C. § 2254 (d).

November 14, 2000.